811 F.2d 1008
 UNITED STATES ex rel. Mylon C. CROSS, Petitioner-Appellee,
v.
Richard DeROBERTIS, Warden, Stateville Correctional Center
and Neil F. Hartigan, Attorney General of the
State of Illinois, Respondents-Appellants.
 No. 86-2844.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 6, 1987.
Decided Jan. 28, 1987.*
Opinion Feb. 10, 1987.
 
 David E. Bindi, Illinois Atty. Gen. Office, Chicago, Ill., for respondents-appellants.
 Frederick F. Cohn, Frederick F. Cohn, Ltd., Chicago, Ill., for petitioner-appellee.
 Before HARLINGTON WOOD, Jr., FLAUM, and RIPPLE, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 This case is here on expedited appeal from a judgment of the district court granting the petitioner-appellee, Mylon Cross, a writ of habeas corpus pursuant to 28 U.S.C. Sec. 2254. For the reasons set forth in the following opinion, we reverse the judgment of the district court and remand the case for further proceedings.
 
 
 2
 * A. Facts
 
 
 3
 Along with a co-defendant, the petitioner was charged and, after a jury trial, found guilty of rape and deviate sexual assault. The factual account offered by the state at trial, through the testimony of the victim, is set out in plenary fashion in the opinion of the Appellate Court of Illinois, State v. Williams and Cross, 94 Ill.App.3d 241, 49 Ill.Dec. 820, 418 N.E.2d 840, 844-45 (1981), and in the opinion of the district court. United States ex rel. Cross v. DeRobertis, No. 82 C 4072 (N.D.Ill. Oct. 9, 1986) [hereinafter cited as Mem. op. (Oct. 9, 1986) ]; R.74. Detailed repetition is not required here. In summary, the victim testified that she was forced into Mr. Cross' car and taken at gunpoint to his hotel room. There, she was forced to disrobe, and, over a period of four hours, repeatedly raped and otherwise physically abused by Mr. Cross and the co-defendant. She further testified that a tape recording was playing loudly in the course of the abuse and that, at one point, two people came to the door and told her assailants that the desk clerk would call the police if the noise were not subdued. According to her testimony, she finally escaped, ran from the hotel completely naked, and found shelter in a passing taxi. She told the driver she had been raped. She further testified that, from the taxi, she saw the defendants getting into their car. The cab driver and the driver of another car followed the defendants' car until it stopped.
 
 
 4
 The victim testified that she had seen Mr. Cross about four times before that evening when she had been with her boyfriend, Willie Taylor.
 
 
 5
 In addition to the testimony of the victim, the state offered the testimony of the cab driver and the driver of the other car involved in the chase of the defendants' car. It also offered the testimony of one of the desk clerks of the hotel who testified that she observed the defendants and the victim go up to the hotel room, although she did not notice the victim's face. She also testified that later she saw the victim run from the hotel, completely naked. The state also produced photographs of the victim that showed that her forehead and eyes were swollen and cut and that her back was permanently scarred.
 
 
 6
 The co-defendant did not testify. However, Mr. Cross did take the stand. He testified that--contrary to the victim's testimony--he had, since meeting the victim three months before the incident, spent time with her approximately five times a week and had been with her over thirty times outside the presence of her boyfriend. According to Mr. Cross, the victim had visited his room on many occasions and had engaged in sexual intercourse with him about twenty times. He testified to three specific occasions when others had seen him with the victim: 1) an encounter with the victim and her boyfriend at the Stand Up Bar; 2) an overnight stay at his sister's home; 3) an incident at a Shell station where Mr. Cross and Mr. Taylor had argued over "rights" to the victim. This portion of Mr. Cross' testimony was corroborated by four witnesses. Each of these witnesses was a relative or close friend of Mr. Cross.
 
 
 7
 Mr. Cross' account of events on the day of the incident was substantially different than that offered by the victim. According to Mr. Cross, he and the victim were drinking together all afternoon at the home of a friend. They spent the early evening hours visiting various bars. When they left the last one around midnight, the victim, the codefendant, and Mr. Cross were all "wasted." They drove to the hotel where the petitioner had a room. The three walked through the hotel lobby. No one had a gun. When they entered Mr. Cross' second-floor room, he put on a tape recording. The co-defendant left the room to purchase cigarettes. According to Mr. Cross, after the co-defendant left, the victim took her clothes off and slipped under the bed sheets. The petitioner sat in a chair across from the bed and fell asleep. When he awoke at approximately 4:00 a.m., the victim had gone but the co-defendant had returned. He further testified that he did not engage in sexual intercourse with the victim during that evening. On cross-examination, he testified that, at some time on April 13, he noticed that the co-defendant had scratches on his face.
 
 
 8
 Mr. Cross' account of the events of the evening in question were challenged in rebuttal by the state. Through the testimony of Mr. Lerner, an assistant state's attorney, the state submitted that Mr. Cross had told Mr. Lerner during an interview on the morning after the event that the co-defendant had borrowed the petitioner's car on the day in question. The petitioner told Mr. Lerner that he had left his mother's house to find the co-defendant and that around 4:00 a.m. he arrived at the hotel to find the co-defendant in his room. He went up to the room and argued with the co-defendant about the car and why the co-defendant had not returned it. Mr. Lerner testified that Mr. Cross told him that he did not see the victim in the hotel room when he arrived there at 4:00 a.m.
 
 
 9
 A close friend of the petitioner testified that he had seen the petitioner and the victim together during the evening of the incident.
 
 B. State Proceedings
 
 10
 On April 28, 1978, Mr. Cross and his co-defendant were charged with having committed the crimes of rape and deviate sexual assault. The trial judge appointed two Cook County public defenders to serve as joint defense counsel for both Mr. Cross and his co-defendant. Several months later, the state brought nine additional charges including three counts of aggravated kidnapping, against both defendants.
 
 
 11
 A trial began on September 11, 1978 and the jury returned verdicts of guilty on all counts but one. However, the trial court entered judgment only on the verdicts of rape, deviate sexual assault, three counts of aggravated kidnapping and one count of aggravated battery. After the denial of all post-trial motions, the trial court sentenced the petitioner to concurrent terms of imprisonment of 30 years for rape and deviate sexual assault and 10 years for each count of aggravated kidnapping. No sentence was imposed for the aggravated battery conviction. On appeal, the Appellate Court of Illinois reversed all but the rape and deviate sexual assault convictions for violation of the Illinois speedy trial act. Further review was denied by the Supreme Court of Illinois.
 
 II
 A. Proceedings in the District Court
 
 12
 Mr. Cross then filed this habeas corpus action in the district court, raising five grounds for relief: 1) denial of effective assistance of counsel, 2) denial of new counsel without due process, 3) improper admission of illegally seized evidence, 4) improper presentation of evidence of post-arrest silence, and 5) denial of due process through advising the jury of nine charges against the defendant that should have been dismissed before trial. After consideration of the petition, a United States Magistrate recommended, on October 26, 1983, to the district judge that the claim of ineffective assistance of counsel due to conflict of interest be dismissed, and that a hearing be held to determine if petitioner's right to the effective assistance of counsel was otherwise denied. The district judge agreed and ordered that a hearing be held before the magistrate. The district court's order directed that the following issues be addressed: 1) whether the petitioner's request for a change of counsel was timely, 2) whether defense counsel failed to prepare adequately for trial, and 3) whether any such lack of preparation resulted in prejudice at the outcome of the trial. United States ex rel. Cross v. DeRobertis, No. 82 C 4072 at 5 (N.D.Ill. Dec. 6, 1983) [hereinafter cited as Mem. op. (Dec. 6, 1983) ]; R. 27 at 5. The other claims asserted in the petition--including the claim that Mr. Cross had been denied the effective assistance of counsel because of an actual conflict of interest--were dismissed.[1] Id. at 6.
 
 
 13
 After conducting a hearing, the magistrate submitted a Report and Recommendation. She first recommended that the district court find that the petitioner's request for change of counsel had been timely. Second, the magistrate recommended that the district court find that defense counsel failed to prepare adequately for trial and that defense counsel's lack of preparation prejudiced the petitioner's case. No objection was entered with respect to the first recommendation and the district court accepted it. The state did object to the second recommendation and the district court proceeded to analyze the merits extensively.
 
 B. Holding of the District Court
 
 14
 In granting the writ, the district court held that the performance of the two county public defenders was not "reasonably effective." Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064-2065, 80 L.Ed.2d 674 (1984). The district court analyzed the evidence contained in the magistrate's report and recommendation with respect to both "components" of the Strickland test--the "performance" component and the "prejudice" component.
 
 1. The "Performance" Component
 
 15
 With respect to the first component--the "performance" component--the district court held that defense counsels' representation failed to meet the prevailing professional standards in three areas. The court determined that: 1) defense counsel failed to establish and maintain the requisite confidential relationship with their client, Mr. Cross; 2) counsel failed to conduct reasonable investigations or make reasonable decisions that investigations of certain facts were necessary to an adequate defense; 3) counsel failed to call or to prepare certain critical witnesses for trial.
 
 
 16
 With respect to the first of these perceived shortcomings, the district court found that counsel never met privately with Mr. Cross nor did they keep him informed of their progress with respect to the case. Their only meetings with Mr. Cross were brief periods in the "bull-pen" of the state trial court before various pre-trial proceedings. The co-defendant was also in the "bull-pen" at the time. During these sessions, noted the district court, counsel did not take any notes of the interviews. With respect to their pre-trial investigation, the district court found that counsel had "relied almost entirely on the notes given to them by the petitioner and assistance from the petitioner's family." Mem. op. at 6 (Oct. 9, 1986); R.74 at 6. The district court noted that, according to Mr. Cross, his counsel did not go over the details of the witnesses' potential testimony but instead suggested that the potential testimony was irrelevant and that all they needed was information regarding what actually happened the night of the alleged crime.
 
 
 17
 With respect to the presentation of the defense, the district court noted that there was no dispute that defense counsel had never discussed the possibility of a plea with the petitioner and that counsel spent absolutely no time preparing the petitioner for his testimony at trial. According to the district court, "[t]hey simply told the petitioner on the morning of the first day of trial that they had prepared the best they could." Id. at 7-8. As noted in the foregoing section, the defense at trial consisted of the testimony of the defendant and the testimony of close friends or relatives who corroborated the events before the alleged incident.
 
 
 18
 The district court found particularly disturbing that defense counsel had not called any witnesses whose testimony might be regarded as "neutral" by the jury. Specifically, the district court noted that defense counsel did not call the people--in all likelihood other tenants of the DeGrace Hotel--who, according to the victim, complained about the noise. Nor did counsel call a Ms. Rollins, the other and more experienced night clerk, to the stand. It was known, from a police report, that she knew both defendants and had observed them and the victim enter the hotel. She also told the police that the co-defendant had been to the hotel earlier that evening and had requested a pass key to Mr. Cross' room. Apparently, the district court was of the view that Ms. Rollins would have been a more effective witness than the desk clerk who did testify. The district court also questioned why counsel had not interviewed the owner of the Stand Up Bar, a man known as "Chick." The petitioner believed that "Chick" would testify that he and the victim oftentimes frequented the bar together. Moreover, Mr. Cross thought that "Chick" might have been present during the telephone conversation allegedly placed by the victim from the Stand Up Bar to the petitioner at the Cook County Jail after the alleged crime. He also thought that "Chick" might testify about another occasion when the victim and Mr. Cross had been seen at the bar together. The district court also questioned why Willie Taylor, the victim's boyfriend, had not been called by the defense. Mr. Cross, while in jail, had written to Mr. Taylor in an attempt to reconcile their differences and had given defense counsel a copy of the letters. The district court found "unsubstantiated" defense counsels' belief that Mr. Taylor would be an adverse witness.
 
 
 19
 The district court also noted that the petitioner testified that he had asked defense counsel to interview a number of other potential witnesses to the events that had occurred at the Shell gas station before the alleged incident. While defense counsel did call a close friend of Mr. Cross to testify about this incident, they did not call the station attendant or several police officers who intervened at the confrontation between Mr. Cross and Mr. Taylor and who took Mr. Taylor's knife from him as he walked away from the scene. Finally, the district court noted that defense counsel did not present the testimony of any of the other "leads" that the petitioner had furnished to them and had not presented the testimony of the police officers who ticketed his car in front of the hotel on the night in question. The district court concluded:In summary, to prepare for what turned out to be a five-day trial on extremely serious charges, defense counsel never met with the defendants except for brief periods of time in the crowded bull pen. They never prepared the petitioner for his testimony at trial, only prepared the other defense witnesses in the courtroom before they testified, and did not even call many critical corroborative witnesses to the stand. They never went to the scene of the alleged crime to investigate, made half-hearted efforts to question some potential witnesses while never talking to many others, and essentially relied on the incarcerated petitioner and his family to provide them with the information necessary to try a rape case in which the central issue was the credibility of the victim and defendants.
 
 
 20
 Id. at 19-20.
 
 
 21
 These deficiencies, suggested the district court, were exploited by the state, which repeatedly pointed out the apparent bias of the witnesses for the defense.
 
 2. The "Prejudice" Component
 
 22
 Turning to the second component of the Strickland analysis--the "prejudice" component--the district court held that there was a reasonable probability that, but for counsels' unprofessional errors, the result of the proceeding would have been different. First, the district court focused upon defense counsels' failure to present any "neutral" witnesses who might have impeached the credibility of the victim.
 
 
 23
 Since by its very nature the crime of rape most often is committed outside the presence of witnesses other than the victim and defendant, rape trials generally can be narrowed down to the question of who will the jury believe. In this case, the victim testified on the stand that she had virtually no prior relationship with the petitioner. The defense attempted to impeach her testimony only through the testimony of four witnesses easily perceived as biased. Defense counsels' failure to put on any "neutral" witnesses was the focus of the government attorney's closing, a closing in which he said credibility was the central issue in the case.
 
 
 24
 Id. at 30-31. Had defense counsel put on "neutral" witnesses to impeach the testimony of the victim, concluded the district court, there is a reasonable probability that her credibility would have been shaken sufficiently that the outcome of the trial would have been different. Moreover, continued the district court, counsel failed to establish a motive for the victim's arguably false testimony or to introduce available evidence to support such a motive. For example, suggested the district court, "if defense counsel had called witnesses to show that, because of prior disputes between Mr. Taylor and the petitioner and because Mr. Taylor was again the victim's boyfriend, she had a motive to accuse the petitioner, the outcome reasonably might have been different." Id. at 33.
 
 III
 A. Applying the Strickland Analysis
 
 25
 In undertaking our review of the district court's decision, our starting point must be the clear mandate of Strickland that, in order to establish that a criminal defendant has been denied his sixth amendment right to counsel, it is necessary that both the "performance" and "prejudice" components of the Strickland analysis be established affirmatively by the petitioner. "Unless a defendant makes both showings, it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." 466 U.S. at 687, 104 S.Ct. at 2064. Strickland did not "establish mechanical rules;" "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." Id. at 696, 104 S.Ct. at 2069. Therefore, the components of the Strickland analysis cannot be treated as hermetically sealed containers. Our inquiry with respect to one component will therefore often shed a valuable cross-light upon our inquiry with respect to the other. Indeed, the Supreme Court noted in Strickland that:a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.
 
 
 26
 Id. at 697, 104 S.Ct. at 2069-70; see also United States ex rel. Smith v. Lane, 794 F.2d 287, 290 (7th Cir.1986); United States v. Liefer, 778 F.2d 1236, 1253 (7th Cir.1985); Rogers v. Israel, 746 F.2d 1288, 1292 & n. 3 (7th Cir.1984).
 
 
 27
 In this case, the "performance" issue requires a particularly subtle assessment of whether trial counsel, presented by their client with a rather unusual "alibi," sufficiently investigated and presented specific factual questions. Some of those factual questions (regarding the victim's previous relationship with Mr. Cross) concerned the victim's credibility. Others, concerning the degree of noise in Mr. Cross' room that evening, concerned the accuracy of the victim's account of the episode and Mr. Cross' assertion that he slept through it. Strickland mandates that counsel's duty to investigate or to make a decision that particular investigations are unnecessary must be governed by a "reasonableness" standard. 466 U.S. at 691, 104 S.Ct. at 2066. The Supreme Court has specifically admonished lower courts that such judgments are due "a heavy measure of deference." Id. Nevertheless, the temptation to use hindsight in making such an assessment is always strong and it takes no small effort "to eliminate [its] distorting effects" and "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689, 104 S.Ct. at 2065.
 
 
 28
 The district court first addressed the "performance" issue and then the "prejudice" issue. However, given the difficulty of the assessment involved in the "performance" issue, we believe that this case is a particularly good one in which to heed the Supreme Court's advice and to address first the "prejudice" component of the Strickland test. If it is determined that the petitioner was not prejudiced by the alleged delicts of counsel, it will not be necessary to rule definitively on the difficult "performance" question. Moreover, if the "performance" issue must be reached, our appreciation of the consequences of counsels' action may well help us to evaluate the reasonableness of those actions.
 
 B. Evaluating the "Prejudice" Component
 
 29
 In evaluating the "prejudice" component, the district court quite correctly noted that it is "not enough for the petitioner to show that the errors had some conceivable effect on the outcome of the proceeding." Mem. op. at 30 (Oct. 9, 1986); R.74 at 30. Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.
 
 
 30
 Here, the district court concluded that "a reasonable probability exists that, had defense counsel put on neutral witnesses to impeach the testimony of the victim, her credibility would have been shaken sufficiently such that the outcome would have been different." Id. at 31. Moreover, concluded the district court, the petitioner was prejudiced by the failure of the defense counsel to establish a motive for the victim's arguably false testimony. Finally, the court concluded that, had counsel visited the scene of the crime, questioned the tenants of neighboring rooms at the DeGrace Hotel, or subpoenaed the hotel guest list for the evening in question, the defense could have disputed directly the victim's allegation that her screams brought protests from others in the hotel.
 
 
 31
 While positing that such testimony would have helped significantly the position of the defendant at trial, the district court did not require that the petitioner demonstrate that such testimony would in fact have been given by the witnesses who were not called. While acknowledging that "in some cases a court may require that a petitioner locate the potential witnesses and have them testify at the hearing," id. at 34, and that "the proper course for the petitioner would have been to call these potential witnesses at the hearing," id., the court excused the petitioner from this obligation. The court noted that, because Mr. Cross had told his counsel of the existence of these witnesses prior to trial, there was no possibility of post-trial fabrication. Furthermore, noted the district court, when it first ordered the hearing before a magistrate, it "did not order that the petitioner locate these witnesses and have them testify; it merely ordered that there be a hearing partially on the issue of whether any lack of preparation resulted in prejudice to the outcome at trial." Id. (citing Mem. op. at 5 (Dec. 6, 1983)). Moreover, continued the district court:
 
 
 32
 Forcing the petitioner to show specific prejudice resulting from his counsel's unpreparedness imposes an unfair burden on the petitioner. Where, as in this case, defense counsel did not attempt to obtain corroborating witnesses or otherwise to conduct a minimal pretrial investigation, the record is necessarily incomplete as to the extent of the prejudice which resulted from counsel's dereliction. It would be anomalous for the court to decide that a near-total failure to prepare for trial and present all corroborative witnesses demonstrates incompetence of counsel, but then to deny any relief because the defendant cannot point to the rest of the record to show how the omissions affected the judgment, especially in a jury trial where no findings of fact are made.
 
 
 33
 Id. at 35-36 (citations omitted). "[I]n light of the ... deficiencies of counsel, the corroborative evidence of what the potential testimony would have been and the ambiguity of Judge Hart's order," the district court determined that "the failure to call potential witnesses does not undermine petitioner's claim of prejudice." Id. at 34-35.
 
 
 34
 Here, we must respectfully disagree with the district court. In a collateral attack pursuant to 28 U.S.C. Sec. 2254 on a state criminal conviction, the ultimate burden of establishing that the state proceeding that resulted in the conviction violated the constitution remains on the petitioner. When, as here, the petition is based on an allegation that, in the state proceedings, the petitioner was denied his sixth amendment right to the effective assistance of counsel, it is the burden of the petitioner to establish both components of the Strickland inquiry. See Johnson v. Duckworth, 793 F.2d 898, 900, 902 n. 3 (7th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 416, 93 L.Ed.2d 367 (1986); United States v. Goudy, 792 F.2d 664, 672 (7th Cir.1986); Rogers, 746 F.2d at 1292. With respect to the "prejudice" component, that burden can be met, as the district court acknowledged, only if the petitioner establishes that there is a reasonable probability that, absent the alleged errors of counsel, the factfinder would have had a reasonable doubt respecting guilt. 466 U.S. at 695, 104 S.Ct. at 2068. Certainly, it is neither possible nor appropriate to establish a rigid formula or a single, absolute criterion to measure whether this burden has been met. The duty of the district court hearing an ineffectiveness claim is to consider:
 
 
 35
 the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.
 
 
 36
 Id. at 695-96, 104 S.Ct. at 2069. The "ultimate focus of inquiry," Strickland tells us, must be "on the fundamental fairness of the proceeding whose result is being challenged." Id. at 696, 104 S.Ct. at 2069; see also Lane, 794 F.2d at 290; Nealy v. Cabana, 764 F.2d 1173, 1179 (5th Cir.1985).
 
 
 37
 When the allegation of the ineffectiveness of counsel centers on a supposed failure to investigate, we cannot see how, especially in the context of a habeas proceeding that collaterally attacks the state court conviction, the petitioner's obligation can be met without a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained from such an investigation and whether such information, assuming its admissibility in court, would have produced a different result. Under usual circumstances, we would expect that such information would be presented to the habeas court through the testimony of the potential witnesses. "Complaints of uncalled witnesses are not favored in federal habeas review." Murray v. Maggio, 736 F.2d 279, 282 (5th Cir.1984). Therefore, if the potential witnesses are not called, it is incumbent on the petitioner to explain their absence and to demonstrate, with some precision, the content of the testimony they would have given at trial.[2] The district court simply cannot fulfill its obligation under Strickland to assess prejudice until the petitioner has met his burden of supplying sufficiently precise information. Cf. Coleman v. Brown, 802 F.2d 1227, 1234 (10th Cir.1986) ("Weighing this potential evidence, whose very existence is dubious, against the evidence produced at trial ..., we are unable to conclude that the alibi testimony would have altered the trial's outcome.").
 
 
 38
 We understand that fulfilling this burden will at times be a difficult one for the incarcerated petitioner and, in the appropriate case, this consideration should prompt the district court to appoint counsel to ensure the just and efficient disposition of the petition. We also note that the task of the district court is to assess the fairness of the original trial--not to predict the outcome of a future state proceeding.
 
 
 39
 In our view, it is especially important in this case that the district court have the opportunity to assess comprehensively the proposed testimony of the missing witnesses. As the state points out:
 
 
 40
 Two immutable facts emerge from this case: petitioner, by his own admission, was in room 203 of the DeGrace Hotel on the early morning of April 13, 1978; and Christine Martins entered that room at 12:30 p.m., in good physical condition and apparently calm, but left it three and [a] half hours later, savagely beaten, stark naked, hysterical, and running down the street screaming that she had been raped.
 
 
 41
 Appellants' Br. at 33. The testimony that Mr. Cross now suggests was missing would not have changed that reality. At best, the testimony that Mr. Cross suggests might have been given by the persons who were not called might have conflicted with the victim's assertion that she and Mr. Cross had not previously been on intimate terms. It might have supported Mr. Cross' assertion, contrary to the victim's, that there was no loud noise in the room and that he could have dozed all night. However, that testimony also might have been supportive of the state's case or so equivocal as to have been of little help or even detrimental to Mr. Cross' case. Cf. Nealy, 764 F.2d 1173 (testimony of missing witnesses at habeas hearing established prejudice component because it directly contradicted prosecution evidence and directly supported defendant's theory of the case).
 
 
 42
 If the testimony had been favorable to Mr. Cross, the district court would have had to weigh whether, in light of the defense's theory of the case, its omission was so central as to establish the probability that the jury would not have returned a finding of guilt. This assessment is, in the first instance, for the district court. However, at this point, it is clear that Mr. Cross' "conclusory allegations fall far short of showing ... that his attorney[s'] conduct prejudiced the outcome of the trial." Goudy, 792 F.2d at 672.
 
 
 43
 Accordingly, we hold that the record was not sufficiently developed to allow a comprehensive analysis of the "prejudice" component of the Strickland test. However, we do not believe that, at this point, this incompleteness can fairly be characterized as a failure of proof on the part of Mr. Cross. The two judges of the district court who heard the matter were of the view that the proof that we now hold is required under the "prejudice" component was unnecessary. We therefore remand the case to the district court to permit further proceedings in accordance with this opinion.
 
 
 44
 Accordingly, the judgment of the district court is reversed and the case is remanded for further proceedings in conformity with this opinion. The mandate of this court will be issued immediately.
 
 
 45
 REVERSED AND REMANDED.
 
 
 
 *
 Because of the expedited nature of this appeal, this opinion was released in typescript form on January 28, 1987
 
 
 [1]
 Conflict of interest in the representation at trial of the codefendants Cross and Williams is not an issue on appeal. The magistrate considered the merits of the conflict of interest claim and recommended that the district court dismiss the claim as meritless. The magistrate notified the parties that they had 10 days to object to the magistrate's proposed findings and recommendations. No objections were filed to the finding that there was no conflict of interest or to the recommendation that the conflict of interest claim be dismissed. The district court adopted the magistrate's recommendation and dismissed the conflict of interest claim. The parties have waived appellate review of the conflict of interest claim by not filing objections as required by Rule 8 of Rules Governing Section 2254 Cases in the United States District Courts and N.D.Ill.R. 2.44. (While the magistrate stated that the 10-day limitation on objections to the report and recommendation was mandated by Fed.R.Civ.P. 72(b), that rule does not apply to habeas corpus actions. See Fed.R.Civ.P. 72(b) advisory committee notes. Rather, Rule 8 of the Rules Governing Section 2254 Cases applies. Rule 8(b)(3), like Rule 72(b), allows the parties to submit written objections within 10 days of being served with a copy of the proposed findings and recommendations.) Issues to which there are no objections are waived. Thus, the dismissal of the conflict of interest claim for lack of merit is not appealable. See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir.1986)
 
 
 [2]
 The district court noted the existence of a police report of an interview with Ms. Rollins, a night clerk at the DeGrace Hotel who was not called as a witness. The mere existence of a police report setting forth, in summary fashion, Ms. Rollins' observations, without any explanation as to why she was not called in the habeas proceeding, is not sufficient. Standing alone, the police report would hardly afford the district court an adequate opportunity to assess whether the absent witness' testimony, cumulative in many respects with that of a witness who was called, would have made a difference in the outcome of the trial