James Henry CARPENTER, Petitioner,

v.

Donald T. VAUGHN, Superintendent, State Correctional Institution at Graterford, Pennsylvania, Respondent.

No. 1:CV–91–0934.

United States District Court, M.D. Pennsylvania.

May 30, 1995.

Spero T. Lappas, Harrisburg, PA, for petitioner.

Ernest D. Preate, Jr., Atty. Gen. of PA, Office of Atty. Gen., Harrisburg, PA, H. Stanley Rebert, John W. Thompson, Jr., York, PA, for respondent.

*MEMORANDUM*

McCLURE, District Judge.

**BACKGROUND:**

Petitioner James Henry Carpenter, an inmate at the State Correctional Institution at Graterford, Montgomery County, Pennsylvania, seeks a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On January 20, 1984, petitioner was convicted by a jury in York County, Pennsylvania, and was sentenced to death. A direct appeal to the Supreme Court of Pennsylvania followed, as well as proceedings under the Pennsylvania Post–Conviction Relief Act, 42 Pa.Cons. Stat.Ann. §§ 9541 et seq. Petitioner's conviction has been affirmed in all proceedings.

While petitioner's appeal to the Supreme Court of the denial of post-conviction relief was pending, a death warrant was issued. This court issued a stay of execution, then stayed proceedings in this court pending disposition of the state appeal. On November 28, 1994, we issued a memorandum and order intended to narrow the issues before this court, and dismissed all of the claims raised by petitioner save two, those being:

> (5) ineffective assistance of counsel for failure to object to the trial court's answer to a jury question; [and]

> (16) ineffective assistance of counsel for failure to call for testimony at trial an eyewitness who would have corroborated petitioner's version of events; . . .

Memorandum dated November 28, 1994 (record document no. 57), at 5, 6; Order of Court

dated November 28, 1994, at 1 ¶ 1. We then directed further briefing on specified issues.

Later, on February 8, 1995, we directed briefing on the issue of a miscarriage of justice for the purpose of avoiding a procedural bar in a habeas corpus action, to be based upon the opinion of the Supreme Court of the United States in *Schlup v. Delo,* —— U.S. ——, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

All briefs now having been filed, the remaining matters are ripe for disposition.[1]

**DISCUSSION:**

**I. FAILURE TO CALL EYEWITNESS**

In our prior memorandum, we discussed at length the standard governing consideration by this court of the issue of ineffective assistance of counsel for failure to call an eyewitness whose testimony would have corroborated that of petitioner. Since the issue had never been raised in prior proceedings, petitioner failed to exhaust his remedies in the state courts pursuant to 28 U.S.C. § 2254(b). We determined that a "cause and prejudice" standard would apply, but that petitioner had failed to demonstrate cause for the failure.

■ Despite an inability to show cause and prejudice, a petitioner may raise an unexhausted claim "if he or she can show that a fundamental miscarriage of justice would result from a failure to entertain the claim." Memorandum dated November 28, 1994, at 37–38 (quoting *McCleskey v. Zant,* 499 U.S. 467, 494–495, 111 S.Ct. 1454, 1470,

---

1. Nearly four years have passed since the original filing of a petition for a writ of habeas corpus. An explanation of the delay between filing and disposition appears to be in order.

At the time the original petition was filed, final appeal of petitioner's PCRA proceedings remained pending before the Supreme Court of Pennsylvania; this court asserted jurisdiction only for the purpose of issuing a stay of execution, and all other matters were stayed in this court. The stay of proceedings was lifted upon issuance of the opinion of the state Supreme Court on November 19, 1992. With the assistance of the Federal Public Defender's Office, the court then sought to appoint counsel for petitioner, a matter of some difficulty due to the lack of attorneys experienced in the law of federal death penalty habeas corpus proceedings.

When counsel was assigned, the court directed the filing of an amended petition for a writ of

habeas corpus, for the purpose of identifying precisely the issues before the court. We then permitted counsel to undertake discovery, some of which was delayed due to the unavailability of petitioner's PCRA counsel; we later held that this discovery was unnecessary for purposes of these proceedings.

We then issued our Memorandum and Order of Court dated November 28, 1994, dismissing a number of petitioner's claims and narrowing the issues before the court. Issuance of our opinion was delayed in part due to the necessity of extensive research by the court, as discussed in that memorandum. Finally, upon issuance of the opinion of the Supreme Court of the United States in *Schlup,* we directed further briefing by the parties, necessitating the last delay of our disposition of the amended petition.

113 L.Ed.2d 517 *reh'g denied,* 501 U.S. 1224, 111 S.Ct. 2841, 115 L.Ed.2d 1010 (1991)). As noted, in *Schlup,* the Supreme Court revisited the standard governing a "fundamental miscarriage of justice" for purposes of avoiding a procedural bar to habeas corpus relief. We turn first to the standard governing effective assistance of counsel.

### A. Effective Assistance of Counsel

■ Reversal of a conviction or death sentence is warranted when the petitioner is able to establish that (1) the performance of counsel fell below an objective standard of reasonableness, and (2) the errors of counsel prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687–688, 691–692, 104 S.Ct. 2052, 2064, 2066–2067, 80 L.Ed.2d 674 (1984).

> A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Id.* at 690, 104 S.Ct. at 2066. As to the prejudice prong of this test:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694, 104 S.Ct. at 2068.

■ The burden of proving a claim of ineffective assistance of counsel is on the petitioner.

In a collateral attack pursuant to 28 U.S.C. § 2254 on a state criminal conviction, the ultimate burden of establishing that the state proceeding that resulted in the conviction violated the constitution remains on the petitioner. When, as here, the petition is based on an allegation that, in the state proceedings, the petitioner was denied his sixth amendment right to the effective assistance of counsel, it is the burden of the petitioner to establish both components of the *Strickland* inquiry....

*United States ex rel. Cross v. DeRobertis,* 811 F.2d 1008, 1015 (7th Cir.1987), *cert. denied,* 498 U.S. 842, 111 S.Ct. 122, 112 L.Ed.2d 91 (1990).

■ With respect to a claim of ineffective assistance for failing to call a witness, the petitioner must show that (1) defense counsel knew or should have known about the testimony and (2) the testimony is truly exculpatory. "Defense counsel has no obligation to call, or even to interview, a witness whose testimony would not have exculpated the defendant or would have been inconsistent with the theory of the defense." *United States v. Jones,* 785 F.Supp. 1181, 1183 (E.D.Pa.) (citations omitted), *aff'd,* 980 F.2d 725 (3d Cir. 1992) (table). *See also Reese v. Fulcomer,* 946 F.2d 247, 257 (3d Cir.1991) (no ineffectiveness in failing to call an alibi witness when witness' testimony could have been damaging to defense), *cert. denied,* 503 U.S. 988, 112 S.Ct. 1679, 118 L.Ed.2d 396 (1992).

■ In order to be entitled to an evidentiary hearing on a petition for a writ of habeas corpus, the petitioner has the burden to allege facts which, if proven, would entitle him or her to relief. *Ellis v. Lynaugh,* 873 F.2d 830, 840 (5th Cir.), *cert. denied,* 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 384 (1989). A hearing is not required when the record is complete or when the petitioner raises only legal claims for which no evidence is necessary. *Id.*

■ In order to establish his claim of ineffective assistance of counsel based upon the failure to call a witness, petitioner must show that a witness not called by counsel would have offered exculpatory evidence, and that absence of the testimony is sufficient to un-

dermine confidence in the outcome of the trial.

It should be noted, however, that petitioner in this case bears an extra burden, that of demonstrating a basis for avoiding the procedural bar of failure to exhaust his state court remedies. We turn next to the standard for establishing a miscarriage of justice sufficient to avoid a procedural bar to habeas corpus relief.

## B. Failure to Exhaust

■ As noted, the Supreme Court of the United States discussed at length the standard for avoiding a procedural bar to consideration of the merits of a petition for a writ of habeas corpus in *Schlup v. Delo*.[2] The Court held that, when a petitioner seeks to avoid a procedural bar, he or she must demonstrate that failure to consider the merits of a claim would result in a fundamental miscarriage of justice, which is tied to the petitioner's actual innocence. —— U.S. at ——, 115 S.Ct. at 864, 130 L.Ed.2d at 832. Relying upon *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), the Court held that the miscarriage of justice exception applies when the petitioner shows

> ... that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." [*Carrier*, 477 U.S. at 496, 106 S.Ct. at 2649]. To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.

*Schlup*, —— U.S. ——, 115 S.Ct. at 867, 130 L.Ed.2d at 836. The reviewing court makes its determination in light of all of the evidence, including "relevant evidence that was either excluded or unavailable at trial[,]" i.e. the "new evidence." *Id.*

## C. Petitioner's "New Evidence"

Petitioner in this case argues that he is actually innocent of the crime for which he was convicted. In fact, his argument in this

respect has been consistent from the time of trial and throughout his appeals: petitioner was present at the time of the murder, but it was his girlfriend, Ruth Emmil, that committed the crime.

The "new evidence" presented by petitioner is the testimony of Frankie Stewart, a purported eyewitness to the murder. Trial counsel for petitioner did not call Stewart at the time of trial, despite the fact that Stewart made statements which may indicate that petitioner was not guilty of the crime. No recent affidavit from Stewart has been presented; petitioner relies upon the statements which Stewart made to the police in the immediate aftermath of the crime.

The first of these is set forth in the report of a police officer named Stabley. That report states:

> This officer and Officer Levinsky were on routine patrol and were flagged down by the witness at 50 S. Penn St. The witness was yelling that the victim "Has a hole in his chest!" The victim was lying on his back with his feet on the sidewalk and his head on the roadway directly in front of 50 S. Penn St. This officer got out and approached the victim and observed a small amount of blood on the front of the victim's shirt.

> The victim was unresponsive and this officer lifted the shirt to find a large quantity of blood coming from the chest of the victim. This officer observed the victim gasp slightly then make no further sounds or movements. This officer summoned medical assistance and more police units for assistance.

> Officer Levinsky spoke with the witness while this officer stayed with the victim. There was a bag lying near the victim which was opened by Det. Williams upon his arrival. (The bag contained a 6 pack of beer)

> After the arrival of the medical personell [sic], this officer spoke with the witness/1. She relayed that she was at 49 S. Penn St.

---

**2.** In our earlier memorandum, we discussed specifically three procedural bars, including failure to exhaust state court remedies, procedural default, and abuse of the writ. In *Schlup*, the Supreme Court discussed a fourth, "successive claims." —— U.S. at ——, 115 S.Ct. at 862, 130 L.Ed.2d at 830. *See also Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986).

and was leaving. She saw the victim walking with a cauc. male and a cauc. female. She saw the female turn to the victim and make a motion. The victim then fell to the position in which he was lying upon the arrival of the officers. The suspects then walked south on the sidewalk to King St. and turned west on King. A few seconds thereafter, the officers arrived. The witness was very reluctant to give information to this officer, but she did state that she had seen the suspect (female) before at Paul Brown's speakeasy.

This officer relayed the above information to Det. Williams who continued the interview of the witness from that point.

Plaintiff's Exhibit 23, appended to Deposition of John D. Flinchbaugh, Esquire (record document no. 62); also appended to Respondent's Brief in Opposition to Petition for Writ of Habeas Corpus (record document no. 65).

A second statement by Stewart is set forth in a report which appears to have been completed by a Detective Smallwood. As related to Stewart, the report states:

FRANKIE STEWART, 479 W. King St., 3rd floor, was leaving her parents' home located directly across from 50 S. Penn St. when she observed the victim fall over backwards to the sidewalk and observed two persons walking away from the victim. Frankie Stewart stated that she had had [sic] seen the two actors in the area before and that she could i.d. the two actors if she saw them again. She stated that she knew the one actor as BOB—that he's always down at PAUL BROWN'S place on W. Princess St.

Frankie was brought to the police department by this officer and shown some photos of possible suspects. She could not i.d. anyone at that time.

Police File, Report dated 10/3/83, p. 28 of Plaintiff's Exhibit 22, appended to Deposition of Dennis Williams (record document no. 63); also appended to Respondent's Brief in Opposition to Petition for Writ of Habeas Corpus (record document no. 65).

Finally, a verbatim statement was taken from Stewart by Detective Smallwood. It reads:

Statement taken from FRANKIE STEWART, 487 W. King St., York, Pa., concerning the James Lee Taylor Homicide which occurred 9/30/83, in the first block South Penn St., in the presence of Detective William H. Smallwood and myself, Mrs. Dorothy J. Schwartz, secretary.

Q For the record would you state your name.

A Frankie Stewart.

Q Frankie, where do you live?

A 487 W. King St.

Q What is your date of birth?

A 5/11/53.

Q How old are you?

A 30.

Q Can you read and write?

A Yes.

Q What is the highest grade you completed in school?

A 12th.

Q Frankie, I want to talk to you about an incident that happened in the first block of S. Penn St. This would be 9/30/83, at about 9:30 or 9:40 p.m. Before you make this statement, I want you to state that you are giving this statement of your own free will, without any inducements or incitements, and without any promises. Is this true?

A Yes.

Q Do you remember this incident on the night in question?

A Yes, I do.

Q Will you tell me what you heard or observed?

A I was coming out of my parents' home at 49 S. Penn St. I was going toward my car. I looked across the street and I seen a man on the ground. Two white people walked around the corner. During this time a police officer was coming down the street. I hailed him down. That's it.

Q Where was the car parked at?

A On Penn St. My mom's house is 49. It was up the street. I don't know the address. It was pointed toward Rutter's.

Q From where you saw the two white people turning the corner, where is that exactly?

A On the corner of King St. and Penn.

Q An how far away was it when you saw the victim lying on the street?

A From where he was? To the corner.

Q How far would you say that was in feet or yards?

A 30 feet. They walked around the corner. They didn't run. They might have just saw what I saw and walked around the corner. They could have been walking by, too.

Q Is it any doubt in your mind or could it be possible they were just crossing the street or looking in the show window?

A They didn't cross the street. They went up King St. Past Young's.

Q What is Young's?

A A furniture place.

Q Do they have a show window?

A Yes, they do.

Q Is it possible that these people could have been looking in the display window?

A They could have been.

Q Was there any question in your mind that they might have been involved in the homicide?

A Nope.

Q How much time would you say elapsed from when you came out of your house and saw the police car—was it simultaneously?

A I came out the door and I didn't even have the door the whole way closed. I saw what I saw. I called my mom. We all ran to the door. I just ran across the street to see what the man was doing laying in the street and the police car was coming down the street and I told them to look.

Q At any time did you see these 2 white persons near where Jimmy had fallen?

A No.

Q Do you know a HELEN RUTH EMEL [sic]?

A Yes.

Q Do you know a JAMES CARPENTER?

A Yes, I do but I didn't know that was his last name till I saw it in the paper.

Q Do you know JAKE WEST?

A I know Jake West.

Q Did you see those people in the area?

A Nope.

Q Did you see them later at the King George?

A I didn't see Jake that I remember.

Q What time did you see them? Early morning?

A Night time.

Q The same evening?

A The same evening.

Q How long were you at the bar?

A I forget what time I left here and then I went to get my girlfriend and then we went to the King George. I didn't leave till the doors were closed. So it could have been later.

Q Was it crowded at the bar?

A Yeah.

Q Did you tell people what you saw?

A I told them what I thought I saw.

Q Who did you tell?

A I saw Helen when I walked in the door. I knew Jimmy Lee smacked her boyfriend with a hatchet and she would probably be glad to hear it.

Q When you say "Jimmy Lee", you are referring to......

A JAMES LEE TAYLOR.

Statement of Frankie Stewart, dated October 6, 1983, appended to Respondent's Brief in Opposition to Amended Petition for Writ of Habeas Corpus.

It is not clear which version of events would be the subject of testimony of Stewart at the present time. No recent affidavit or other statement by Stewart has been provided. The court is left to presume, then, that Stewart would testify consistent with the statements she provided to investigators.

At trial, Emmil testified that she and petitioner were walking down the street with another couple when the victim, Taylor, approached. The other couple left, sensing trouble between petitioner and Taylor. An argument ensued, and it was then that peti-

tioner stabbed Taylor. Petitioner's testimony was consistent with Emmil's, except that he denied stabbing Taylor, and claimed that Emmil had done the stabbing. Both also testified that petitioner wrapped the knife in a handkerchief and threw it over a fence.

The problem with Stewart's version of events first is that it is self-contradictory. Stewart first stated that she saw the couple in the vicinity of Taylor, that the woman made a motion toward Taylor, and that Taylor then fell. She later stated that the couple she saw were never in the immediate vicinity of Taylor.

The second problem with Stewart's statement is that it does not corroborate petitioner's version of events. According to Stewart, the couple that she saw were both white, while petitioner is black, with a dark complexion. *See* Deposition of Dennis Williams at 20. Stewart heard no argument, and the couple she saw left in a different direction than the route taken by Emmil and petitioner. *Id.* at 14. The murder weapon was found along the latter route. *Id.*

Most importantly, Stewart stated that she knew Emmil and petitioner, that they were not in the vicinity of Taylor, and that they were not the couple Stewart saw on the street. In fact, the person identified by Stewart, "Bob," was later located by the York police and was able to account for his whereabouts at the time of the murder.

■ Placing the statements made by Stewart into the context of this case, it cannot be said that no reasonable juror would find beyond a reasonable doubt that petitioner was guilty of the crime charged. Stewart's statements do not support petitioner's

version of events; in fact, they add a whole new theory of the case which is inconsistent with the other evidence of record. A juror would be well within the bounds of reason to discredit testimony based on the statements provided by Stewart.[3] We therefore find that petitioner has not met the threshold burden set forth in *Schlup* for avoiding a procedural bar to consideration of the merits of this issue.

## II. FAILURE TO OBJECT TO JURY QUESTION

In our earlier memorandum, we held that there may have been error in the trial court's answer to a jury question based upon *Simmons v. South Carolina,* — U.S. —, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994).[4] In that case, the Supreme Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." — U.S. at —, 114 S.Ct. at 2189, 129 L.Ed.2d at 138. We directed further briefing on two issues: (1) whether *Simmons* applies retroactively; and (2) whether *Simmons* controls this case.

### A. Retroactivity

■ The question of whether a holding applies retroactively depends first upon whether it is a "new rule." *Teague v. Lane,* 489 U.S. 288, 299–300, 109 S.Ct. 1060, 1069, 103 L.Ed.2d 334 (1989). Generally, "a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." 489 U.S. at 301, 109 S.Ct. at 1070. "To put it

---

**3.** According to Detective Williams, this is exactly what the York City Police did early in their investigation. Deposition of Dennis Williams at 14–15, 18–20.

**4.** Petitioner raised this issue in a claim of ineffective assistance of counsel, while *Simmons* considers the issue in the context of the due process. In our earlier memorandum, we held that the failure to so designate the claim did not affect the exhaustion of the claim, since the purported error by counsel was the failure to object to the due process violation. Memorandum of November 28, 1994, at 28. Moreover, the Supreme Court of Pennsylvania specifically addressed the propriety of the response to the jury's question.

*Com. v. Carpenter,* 533 Pa. 40, 617 A.2d 1263, 1269–1270 (1992). *See* 28 U.S.C. § 2254(c); *Castille v. Peoples,* 489 U.S. 346, 349–350, 109 S.Ct. 1056, 1059, 103 L.Ed.2d 380, *reh'g denied,* 490 U.S. 1076, 109 S.Ct. 2091, 104 L.Ed.2d 654 (1989) (issue exhausted when it has been presented to the highest court of the state); *Evans v. Court of Common Pleas of Delaware County,* 959 F.2d 1227, 1231 (3d Cir.1991) (issue fairly presented to state court when both the legal theory and the facts underpinning the claim have been presented, and same method of analysis available to state court as will be employed in federal court).

differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Id.* (emphasis in original).

The question, then, is whether the Court's holding in *Simmons* was dictated by prior precedent.

■ The holding of *Simmons* plainly was dictated by precedent existing at the time of petitioner's conviction. In *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), the Court held that there was a violation of the defendant's due process rights when he was sentenced to death based on a presentence report which had not been made available to him. In *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), the Court held that the Due Process Clause was violated when the defendant was not permitted to present evidence of good behavior while in prison. The principle underlying both of these holdings was that "sending a man to his death 'on the basis of information which he had no opportunity to deny or explain' violated fundamental notions of due process." *Simmons*, —— U.S. at ——, 114 S.Ct. at 2194, 129 L.Ed.2d at 143 (quoting *Gardner*, 430 U.S. at 362, 97 S.Ct. at 1206). That this conclusion was "dictated" by precedent was answered by the Court itself: "The principle announced in *Gardner* was reaffirmed in *Skipper*, and compels our decision today." *Simmons*, —— U.S. at ——, 114 S.Ct. at 2194, 129 L.Ed.2d at 143 (further citations omitted).

Respondent points out that *Simmons* is a plurality opinion. Respondent's Brief in Opposition to Petition for Writ of Habeas Corpus at 3. In her concurring opinion, however, Justice O'Connor relies upon the same principle and cites the same precedents, ——

U.S. at ——, 114 S.Ct. at 2200, 129 L.Ed.2d at 150, so that seven members of the Court agreed, at least to the extent that, when the state puts the defendant's future dangerousness at issue, the sentencing jury is entitled to know that the defendant is parole ineligible.[5]

*Gardner* was decided in 1977; petitioner was convicted and sentenced in 1984. Since the *Simmons* holding was dictated (or "compelled") by precedent existing at the time of petitioner's conviction, *Simmons* applies retroactively to petitioner's case.

### B. Application

Having determined that *Simmons* applies retroactively, the next question is how that opinion applies to the instant case. As noted, the Supreme Court held that the defendant has the right to have the jury informed of parole ineligibility when the state puts the defendant's future dangerousness at issue. The threshold question, then, is whether petitioner's future dangerousness was at issue.

■ In our prior memorandum, we noted that the theory upon which the prosecutor relied at the sentencing phase of petitioner's trial was that of a significant history of felony convictions involving the use or threat of violence to the person. *See* 42 Pa.Cons.Stat. Ann. § 9711(d)(9). This factor was supported by evidence of prior convictions for third-degree murder and assault by a prisoner. We also pointed out, however, that such a factor may entail the risk of implicating future dangerousness. It should be noted that the plurality opinion in *Simmons* specifically refers to "generalized arguments regarding the defendant's future dangerousness," thereby including within the holding more than direct arguments on the issue.

**5.** One disagreement among members of the Court may be seen in answering the question of how the jury is to be informed of parole ineligibility. Justice Blackmun's plurality opinion states that due process is satisfied by either a jury charge or argument by defense counsel. Justice Souter's concurring opinion states that the Eighth Amendment requires that the trial court charge the jury on this point. Justice O'Connor's concurring opinion states that due process is satisfied if the relevant information is intelligently conveyed to the jury. Justice Ginsburg's con-

currence notes that, with respect to the due process arguments, the opinions do not conflict, and notes that there is no conflict with respect to the Eighth Amendment, since only the opinion of Justice Souter reaches the question.

A second area of disagreement among the Justices is the necessity of the state bringing future dangerousness into dispute as triggering the defendant's right to have the jury informed of parole ineligibility. This issue is discussed later in this memorandum. *See* § II.B. at 18–19.

Only two persons testified during the penalty phase of petitioner's trial. The first was H. Albert Bohner, who testified for the purpose of providing a foundation for records of petitioner's prior convictions. The second was petitioner, who testified regarding his work record and behavior between his release from prison and the night of the murder. Petitioner also testified about prior incidents involving Taylor.

Counsel for petitioner then made a closing argument, followed by the prosecutor. The latter argument began with a summary of a criminal defendant's constitutional rights, then turned to an argument that, having had his rights observed, the defendant was subject to the punishment that the people of the Commonwealth had decided was appropriate. The prosecutor argued that he had proven an aggravating factor, and finished as follows:

> As an attorney for the people of the State, I am arguing to you now that the Commonwealth has proved the aggravating circumstances of the history of violent crimes in this Commonwealth on the part of the Defendant. The Defendant has murdered before. I argue to you that is aggravating circumstance [sic] that you might consider. What could be more of an aggravating circumstance? The Defendant had his chance. Thank you.

N.T. 1/20/84 (5:30 p.m.), Sentencing Hearing, at 33–34. Nowhere in either the evidence presented or the closing argument did the prosecutor make a direct argument regarding petitioner's future dangerousness.

The prosecutor also did not make any generalized argument concerning petitioner's future dangerousness. Instead, he emphasized the aggravating circumstance at issue, the prior felonies. Petitioner argues that the statement that "[t]he Defendant had his chance[,]" coupled with the evidence that petitioner was a parolee, brings petitioner's future dangerousness into dispute. As we noted in our prior memorandum,

> Nothing in the quoted provision indicates that the prosecutor was arguing that petitioner should have the death penalty imposed due to commission of the crime while petitioner was on parole. The message conveyed actually is that petitioner did not learn from having been convicted of murder the first time. The statement by the prosecutor simply does not convey the message which petitioner contends is conveyed.

Memorandum dated November 28, 1994, at 40–41. The statement related to petitioner's "chance" appears in the context of a discussion of the prior conviction, not the fact of parole.

It also should be noted that the references in the testimony of Mr. Bohner to petitioner's parole relate to the identification of petitioner as the person convicted of the prior felonies. No suggestive question was asked and no statement was made by the prosecutor suggesting that the jury should consider petitioner's parole status when it deliberated upon a sentence.

In this respect, we note that, in *Simmons,* only Justices Souter and Stevens opined that a defendant is entitled to argument or an instruction on parole ineligibility regardless of whether the state has placed future dangerousness at issue. *See Simmons,* —— U.S. at ——, 114 S.Ct. at 2198–2199, 129 L.Ed.2d at 147–149 (Souter, J., concurring, joined by Stevens, J.; argument based upon Eighth Amendment). Justice O'Connor, on the other hand, stated:

> ... [I]f the prosecution does not argue future dangerousness, the State may appropriately decide that parole is not a proper issue for the jury's consideration even if the only alternative sentence to death is life imprisonment without possibility of parole.

—— U.S. at ——, 114 S.Ct. at 2189, 129 L.Ed.2d at 150 (O'Connor, J., concurring, joined by Rehnquist, C.J., and Kennedy, J). The dissent expressed the view that it is the states who at all times should decide whether evidence of parole ineligibility should be admitted, regardless of whether future dangerousness is at issue. —— U.S. at ——, 114 S.Ct. at 2201, 129 L.Ed.2d at 154 (Scalia, J., dissenting, joined by Thomas, J.). A majority of the Court therefore held that state law governs the admissibility of evidence of parole ineligibility when the prosecutor does

not put the defendant's future dangerousness at issue.

In sum, then, the prosecutor in this case did not make a direct argument concerning petitioner's future dangerousness. Isolated references to petitioner's parole status, made for the purpose of identifying petitioner, do not constitute a generalized argument regarding petitioner's future dangerousness. And the prosecutor's statement that petitioner "had his chance" was unrelated to petitioner's parole status and eligibility. We therefore hold that the threshold determination that future dangerousness be placed in issue by the prosecution is not present under the facts of this case, and *Simmons* does not apply.

### III. OTHER ISSUES

In our Memorandum and Order dated November 28, 1994, we granted petitioner leave to present factual bases for Issues (21) and (22) of his Amended Petition for a Writ of Habeas Corpus, as well as his claim that the records of his trial are incorrect and unreliable. No factual support for these matters has been forthcoming, and these claims will be dismissed.

### IV. CONCLUSION

Respondent is entitled to judgment on the issues remaining after our Memorandum and Order of November 28, 1994. An appropriate order shall issue.

### ORDER

For the reasons stated in the accompanying memorandum, IT IS ORDERED THAT:

1. Petitioner's amended petition (record document no. 18) for a writ of habeas corpus is denied.

2. Pursuant to Third Circuit Local Appellate Rule 111.3(b), we certify that there is probable cause for appeal of petitioner's amended petition for a writ of habeas corpus.

3. Our stay of execution (record document no. 5), originally issued July 25, 1991, shall remain in full force and effect pending disposition of an appeal, pursuant to Local Appellate Rule 111.3(b).

4. The clerk is directed to enter judgment in favor of respondent and against petitioner, and to close the file.