

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-1-2002

# Carpenter v. Vaughn

Precedential or Non-Precedential: Precedential

Docket No. 95-9001

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Carpenter v. Vaughn" (2002). *2002 Decisions.* Paper 367.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/367

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed July 1, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 95-9001

JAMES H. CARPENTER,

v.

DONALD T. VAUGHN, Warden, State Correctional
Institution at Graterford, PA*

JAMES HENRY CARPENTER,

Appellant

(*See Court Order of 10/19/99 Amending Caption)

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

(Dist. Court No. 91-cv-00934)
District Court Judge: James F. McClure, Jr.

Argued January 19, 2001

Before: BECKER, Chief Judge, ALITO, and
ROTH, Circuit Judges

(Opinion Filed: July 1, 2002)

Billy H. Nolas (argued)
David Wycoff
Defender Association of Philadelphia
Federal Court Division
437 Chestnut Street, Suite 510
Philadelphia, PA 19106

Attorneys for Appellant

D. Michael Fisher
Attorney General
William H. Ryan, Jr.
Executive Deputy Attorney General
Director, Criminal Law Division
Robert A. Graci
Assistant Executive Deputy Attorney
General Law and Appeals
Criminal Law Division
Stuart Suss (Argued)
Senior Deputy Attorney General
Appeals and Legal Services Section

Criminal Law Division
Office of the Attorney General
2490 Boulevard of the Generals
Norristown, Pennsylvania 19403

Attorneys for Appellee

OPINION OF THE COURT

ALITO, Circuit Judge:

James Carpenter appeals the denial of his petition for a writ of habeas corpus. Convicted in Pennsylvania state court of first-degree murder and sentenced to death, Carpenter has pursued a long course of post-conviction litigation in the state and federal courts. In this appeal, he raises numerous arguments, challenging both the guilt and penalty phases of his trial. Some of the claims that he now advances had been fairly presented to the state courts at the time of the District Court decision and are properly before us. Other claims had not been exhausted at the time of the District Court decision, but the Commonwealth has

2

waived exhaustion of those claims, and consequently they too are properly before us. Still other claims were never raised in the District Court but were presented to the state courts after the District Court issued its decision. We decline to entertain those claims here.

We find no merit in the guilt-phase claims that are properly before us for review. However, we reverse the decision of the District Court with respect to Carpenter's sentence because we conclude that his trial counsel provided ineffective assistance at the penalty phase when he failed to object to a highly misleading answer given by the trial judge in response to a jury question about the availability of parole if Carpenter was sentenced to life imprisonment.

I.

The evidence at trial revealed that Jimmie Lee Taylor was stabbed in the heart on South Penn Street in York, Pennsylvania, on the night of September 30, 1983. He was pronounced dead at 10:58 p.m. at York Hospital. The Commonwealth's principal witness at trial was Ruth Helen Emmil, who had previously been Taylor's girlfriend but had left him to live with Carpenter. Emmil testified that Taylor had previously threatened and harassed her and that Carpenter had spoken to Taylor in an attempt to stop the harassment. In May of 1983, Taylor -- apparently without provocation -- hit Carpenter in the face with a hatchet, breaking his jaw and knocking him unconscious.

At trial, Emmil gave the following account of the events on the night of Taylor's death. She and Carpenter had been drinking with another couple in a bar in York. Both couples

left for another bar and were walking down South Penn Street when they encountered Taylor at about 9:30 p.m. As Taylor approached the group, Emmil expressed apprehension. Taylor, who was carrying a six-pack of beer, asked Emmil and the other couple if they wanted some beer. At this point, the other couple proceeded on to the other bar without Carpenter and Emmil. Without provocation, Carpenter took a knife from his pocket and stabbed Taylor in the chest, piercing his sternum and

heart. Carpenter wiped the knife with a handkerchief and tossed both the knife and the handkerchief over a fence into the backyard of a nearby house. (The items were later found by the owner of the house.) Carpenter and Emmil then proceeded to meet the other couple at the bar as planned and had some drinks.

When first questioned by the police, Emmil did not reveal what she knew about the stabbing, but she explained at trial that Carpenter had threatened to kill her if she told anyone what had happened. To add credibility to his threat, Emmil said, Carpenter had told her that he had previously killed an ex-girlfriend. The Commonwealth also presented a witness at trial who testified that Carpenter had offered him $500 to kill Taylor.

Carpenter testified in his own defense. He basically agreed with Emmil's version of the events leading up to the stabbing, but he claimed that it was Emmil who had stabbed Taylor and had disposed of the knife and handkerchief. He admitted that, after the stabbing, he had asked a friend to purchase a knife similar to the one used by Emmil because he was sure that the police would suspect him and he hoped to confuse them. Carpenter also admitted his animosity toward Taylor and that he had threatened revenge shortly after Taylor had attacked him with the hatchet, but he claimed that his desire for revenge had subsided with the passage of time. According to Carpenter, it was Emmil, not he, who could not forget about the hatchet incident or Taylor's harassment.

The jury believed Emmil's version of the events and found Carpenter guilty of first-degree murder on January 20, 1984. Pursuant to 42 Pa. Cons. Stat. S 9711(a), a sentencing hearing was conducted in front of the same jury. The prosecution sought to establish one aggravating circumstance -- that Carpenter had "a significant history of felony convictions involving the use or threat of violence to the person." 42 Pa. Cons. Stat. S 9711(d)(9). The Commonwealth presented evidence that Carpenter had prior convictions for third-degree murder and assault by a prisoner. The jury was instructed on three possible mitigating circumstances: 1) that Carpenter was under the influence of an extreme mental or emotional disturbance; 2)

that Carpenter acted under extreme duress or under the substantial domination of another person; and 3) that Carpenter's character and record and the circumstances of his crime were mitigating factors. See 42 Pa. Cons. Stat. S 9711(e)(2), (5), & (8). The jury found that one aggravating circumstance existed and that it outweighed any mitigating circumstances. Accordingly, the jury sentenced Carpenter to death. See 42 Pa. Cons. Stat. S 9711(c)(1)(iv).

Post-trial motions were filed in and denied by the Court of Common Pleas of York County, and Carpenter was formally sentenced. On direct appeal, the Supreme Court of Pennsylvania affirmed the conviction and sentence of death. Commonwealth v. Carpenter, 515 A.2d 531 (Pa. 1986). Thereafter, Carpenter sought post-conviction relief in both the state and federal courts. In order to decide which claims are properly before us for review, we must trace the complicated procedural history of Carpenter's various petitions and appeals.

II.

A.

In 1989, Carpenter filed his first petition for post conviction relief under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. SS 9541 et seq. The Court of Common Pleas denied relief, and Carpenter appealed to the state supreme court.

In July 1991, while his first PCRA petition was pending before the Pennsylvania Supreme Court, Carpenter filed a petition in the United States District Court for the Middle District of Pennsylvania seeking a writ of habeas corpus under 28 U.S.C. S 2254. The District Court stayed the federal proceedings until the Pennsylvania Supreme Court decided Carpenter's appeal. In 1992, the Pennsylvania Supreme Court affirmed the denial of Carpenter's first PCRA petition. Commonwealth v. Carpenter, 617 A.2d 1263 (Pa. 1992). In 1993, Carpenter filed an amended petition for writ of habeas corpus with the District Court.

In November 1994, the District Court issued an opinion

in the habeas proceeding. Carpenter v. Vaughn , 888 F. Supp. 635 (M.D. Pa. 1994). After identifying 25 claims that had been raised in either the original or the amended federal habeas petition,1 the Court rejected most of those

_____

1. As stated by the District Court, these claims were:

     (1) ineffective assistance of counsel for allowing  the jury to hear that petitioner had a prior criminal record;

     (2) ineffective assistance of counsel for failure to question

prospective jurors on their attitudes towards the death penalty;

(3) ineffective assistance of counsel for failure to present mitigating evidence of Carpenter's background during the penalty phase;

(4) ineffective assistance of counsel for failure to object to an erroneous jury instruction concerning duress in the penalty phase;

(5) ineffective assistance of counsel for failure to object to the trial court's answer to a jury question;

(6) ineffective assistance of counsel for failure to object to Emmil's testimony that she had no criminal record or prior arrest;

(7) ineffective assistance of counsel for failure to prepare Carpenter for his trial testimony;

(8) ineffective assistance of counsel for failure to object to the prosecution's reference to a lie detector test;

(9) ineffective assistance of counsel for failure to object to a statement in the prosecution's closing argument, that defense counsel and the district attorney agreed that whoever had killed the victim was guilty of first-degree murder;

(10) ineffective assistance of counsel for failure  to object to the omission of a jury charge on a potential verdict of second-degree murder;

(11) ineffective assistance of counsel for failure  to object to the omission of a jury charge on a potential verdict of third-degree murder based upon voluntary intoxication;

(12) ineffective assistance of counsel for failure  to object to the jury instruction on aggravating and mitigating circumstances, and on the imposition of the death penalty;

(13) ineffective assistance of counsel for failure  to request jury instructions on the mitigating circumstances of extreme mental or emotional disturbance and duress;

6

claims. All but one of the claims rejected at this point had been considered by the Pennsylvania Supreme Court (either

_____

(14) ineffective assistance of counsel for failure  to object to the jury instruction on duress as a mitigating factor, which erroneously applied the same standard for duress as that required for a complete defense to a crime;

(15) ineffective assistance for failure to object to the erroneous instruction in answer to the question from the jury[mentioned in issue 5 above];

(16) ineffective assistance of counsel for failure  to call for testimony at trial an eyewitness who would have corroborated petitioner's version of events;

(17) ineffective assistance of counsel for failure to object to the prosecutor's statement that Carpenter deserved the death penalty because he "had his chance," having previously been released on parole after a conviction for third-degree murder;

(18) the trial court's instructions failed to allo w the jury to consider all of the relevant mitigating factors;

(19) the parole officer's testimony during the pen alty phase improperly directed the jury's attention toward the possibility of parole;

(20) ineffective assistance of counsel for failure to argue available mitigating factors to the jury;

(21) ineffective assistance of counsel for failure to object to improper voir dire questions by the Commonwealth concerning prospective jurors' attitudes toward the death penalty;

(22) ineffective assistance for failure to challen ge the Commonwealth's exercise of peremptory challenges during jury selection (should investigation reveal improper challenges);

(23) ineffective assistance of counsel for failure to argue that the victim's prior assault on Carpenter constituted a mitigating circumstance;

(24) ineffective assistance of counsel for failure to present evidence, to argue to the jury, and to request a jury instruction regarding mitigating factors recognized in Penry v. Lynaugh, 492 U.S. 302 (1989);

(25) certain official documents including the tria l transcript are incorrect and unreliable and do not accurately reflect the

7

on direct appeal or in reviewing Carpenter's first PCRA petition) and were therefore exhausted. However, the Court also rejected one additional claim (Claim #24) -- that trial counsel was ineffective for failing to argue and present evidence on the mitigating factors recognized in Penry v. Lynaugh, 492 U.S. 302 (1989) -- that had never been raised in the state courts and was thus not exhausted. The Court nevertheless rejected this claim on the merits on the ground that Carpenter had not shown that he had"cause" for the failure to exhaust or that a miscarriage of justice would occur if the claim was not considered. In addition, the Court observed that trial counsel could not have been expected to predict Penry, which was not decided until after Carpenter's sentencing. See Carpenter v. Vaughn , 888 F. Supp. at 657.

The District Court permitted Carpenter to provide factual support for three of his claims2 and ordered supplemental briefing on three others.3 Two of these latter claims -- Claims 5 and 15 -- alleged that trial counsel was ineffective at the penalty phase in connection with an allegedly

erroneous answer given by the judge to a question asked by the jury. The District Court addressed these claims in relation to Simmons v. South Carolina, 512 U.S. 154 (1994), in which the majority held that "[w]here the State puts the

_____

        proceedings in the trial court. [The District Court noted but did not
        number this final claim.]

888 F. Supp. at 641-42.

2. These claims were: (21) "ineffective assistance of counsel for failure to object to improper voir dire questions by the Commonwealth concerning prospective jurors' attitudes toward the death penalty; (22) ineffective assistance of counsel for failure to challenge the Commonwealth's exercise of peremptory challenges during jury selection; and (25) certain documents which are part of the trial record are incorrect and unreliable." 888 F. Supp. at 642.

3. These claims were: "(5) ineffective assistance of counsel for failure to object to the trial court's answer to a jury question; (15) ineffective assistance for failure to object to the erroneous instruction in answer to the question from the jury [mentioned in issue 5 above]; and (16) ineffective assistance of counsel for failure to call for testimony at trial an eyewitness who would have corroborated petitioner's version of events." 888 F. Supp. at 642.

8

defendant's future dangerousness in issue, and the only available alternative sentence to death is life imprisonment without possibility of parole, due process entitles the defendant to inform the capital sentencing jury . . . that he is parole ineligible." Id. at 178 (O'Connor, J., concurring in the judgment); see also id. at 163-64 (plurality opinion).4 The District Court rejected Carpenter's ineffective assistance argument on the ground that trial counsel was not ineffective in failing to make a Simmons objection to the judge's answer since Simmons had not been decided at the time. However, the District Court held that a Simmons "due process claim was inherent in the claim of ineffective assistance of counsel presented to the state courts," and the District Court therefore ordered supplemental briefing on the question whether Simmons could be applied retroactively. 888 F. Supp. at 651.

The District Court also requested further briefing on the claim that counsel was ineffective for failing to call an eyewitness who allegedly would have corroborated Carpenter's version of the events (Claim #16). The Court stated that this claim was not exhausted and that there was no "cause" to excuse the failure to present the claim to the state courts. However, the District Court ordered further briefing because the Court believed that a miscarriage of justice might occur if the claim was not considered. See id. at 655.

In May 1995, after considering the additional briefing, the District Court denied all of the claims that had been left

open by its earlier decision. See Carpenter v. Vaughn, 888 F. Supp. 658, 668 (M.D. Pa. 1995). The Court held that Simmons applied retroactively[5] but that Carpenter's claim failed on the merits because at trial the prosecution had not made a direct argument regarding Carpenter's future dangerousness. See id. The Court disposed of the ineffective assistance claim regarding the eyewitness by holding that the eyewitness's proffered testimony would not have

_____

4. See also Kelly v. South Carolina, 534 U.S. 246 (2002); Shafer v. South Carolina, 532 U.S. 36, 39 (2001).

5. The Supreme Court subsequently held to the contrary in O'Dell v. Netherland, 521 U.S. 151 (1997).

bolstered Carpenter's version of the events. Accordingly, the Court decided that no miscarriage of justice would result from refusal to review the merits of the claim. See id. at 665. Finally, because Carpenter failed to provide any factual basis for the three claims that the Court had permitted him to renew, the Court rejected these three claims. See id. at 668.

Carpenter filed a notice of appeal to our Court after the District Court granted a certificate of probable cause for appeal. Shortly thereafter, Carpenter filed a motion to hold the appeal in abeyance so that he could file a second PCRA petition. We granted that motion.

Carpenter returned to the state courts and filed a second PCRA petition in January 1996. This petition included claims that Carpenter had raised in the District Court, as well as others that he had not. The Court of Common Pleas denied the petition, and the Pennsylvania Supreme Court affirmed in January 1999. Commonwealth v. Carpenter, 725 A.2d 154 (Pa. 1999). Carpenter then filed a motion with this Court seeking a remand so that the District Court could decide whether to permit him to amend his S 2254 petition to add the claims that had been rejected by the state courts in the second PCRA proceeding but that had not yet been presented to the District Court. We denied the motion for remand.

Now on appeal before us, Carpenter asserts claims that come to us in three different procedural postures: (1) claims that were asserted in the original or amended S 2254 petition and that already were properly exhausted when the S 2254 petition was before the District Court; (2) claims that were asserted in the original or amended S 2254 petition, that were unexhausted when presented to the District Court, but that were later raised in the state courts in Carpenter's second PCRA petition; and (3) claims that were never presented to the District Court but were raised in the second PCRA petition. At oral argument and in a supplemental brief, the Commonwealth expressly waived the exhaustion requirement for the second category of

claims noted above.

10

B.

1. Under the version of the federal habeas statute in effect when Carpenter's original and amended habeas petitions were filed, a federal court was prohibited from granting a writ of habeas corpus to a state prisoner unless (1) the petitioner had exhausted the remedies available in the state courts, (2) no state corrective process was available, or (3) circumstances existed that rendered such process "ineffective to protect the petitioner's rights." See 28 U.S.C. S 2254(b) (1988) (amended 1996). A prisoner was deemed not to have exhausted state remedies if the prisoner had the right under state law to raise his or her claims by any available procedure. See 28 U.S.C. S 2254(c) (1988) (amended 1996).

Congress amended the habeas statute when it passed the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 110 Stat. 1214, Pub. L. No. 104-132, and the amendments went into effect on April 24, 1996. AEDPA made important changes in the standards to be applied in determining whether to grant the writ, see 28 U.S.C. SS 2254(d) and (e); Williams v. Taylor , 529 U.S. 362, 411-13 (2000), but AEDPA did not change the previously noted exhaustion requirements. See 28 U.S.C. SS 2254(b) & (c). However, new provisions did address issues relating to exhaustion. One such provision permits a federal court to deny an unexhausted claim on the merits "if it is perfectly clear that the applicant does not raise even a colorable federal claim." Lambert v. Blackwell, 134 F.3d 506, 514-15 (3d Cir. 1997) (quotation and citation omitted) (construing 28 U.S.C. S 2254(b)(2)). In addition, AEDPA provides that a state may not be deemed to have waived exhaustion and may not be estopped from relying on the exhaustion requirement unless the state, through counsel, expressly waives the requirement. See 28 U.S.C. S 2254(b)(3).

In order for a claim to be exhausted, it must be"fairly presented" to the state courts "by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 844-45 (1999). If a claim has not been fairly presented to the state courts and it is still possible for the claim to be raised in the state

11

courts, the claim is unexhausted. Under pre-AEDPA law,6 if a petition contains both exhausted and unexhausted claims, it is a "mixed" petition and, unless the petitioner elects to withdraw the unexhausted claim, the entire petition should be dismissed without prejudice, thereby leaving the petitioner free to return to the state courts to exhaust. See Rose v. Lundy, 455 U.S. 509 (1982).

If a claim has not been fairly presented to the state courts but state law clearly forecloses review, see Lovasz v. Vaughn, 134 F.3d 146, 148 (3d Cir. 1998), 28 U.S.C. S 2254(b)(1)(B) (1988) (amended 1996), exhaustion is excused, see, e.g., Lambert, 134 F.3d at 513, 517-19; Doctor v. Walters, 96 F.3d 675, 681 (3d Cir. 1996), but the doctrine of procedural default may come into play. A procedural default occurs when a prisoner's federal claim is barred from consideration in the state courts by an "independent and adequate" state procedural rule. See, e.g., Doctor, 96 F.3d at 683. Federal courts may not consider the merits of a procedurally defaulted claim unless the applicant establishes "cause" to excuse the default and actual "prejudice" as a result of the alleged violation of the federal law or unless the applicant demonstrates that failure to consider the claim will result in a fundamental "miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991).

C.

When the District Court dismissed Carpenter's S 2254 petition, most of the claims contained in that petition had been exhausted because they had been presented to the Pennsylvania Supreme Court either on direct appeal or in Carpenter's first PCRA petition. Some of Carpenter's claims, however, had not been presented to the state courts. The District Court treated these claims as procedurally defaulted and proceeded to apply the "cause and prejudice" and "miscarriage of justice" standards to these claims. This was error.

_____

6. As noted, under 28 U.S.C. S 2254(B)(2), it is now permissible under some circumstances for an unexhausted claim to be rejected on the merits.

12

Although Carpenter had already filed one PCRA petition by the time he filed his federal petition, Carpenter's ability to assert the new claims in state court was not clearly foreclosed. In Banks v. Horn, 126 F.3d 206 (3d Cir. 1997), the petitioner, like Carpenter, had been sentenced to the death penalty and had already gone through one round of PCRA proceedings when he filed a S 2254 petition containing both exhausted and unexhausted claims. We first acknowledged that the provisions of the PCRA provide that relief is precluded if a prisoner's claim has been previously litigated or waived through failure to raise the issue at trial, on appeal, or in a prior state post-conviction proceeding. See id. at 211 (citing 42 Pa. C. S.SS 9543(a)(3) & 9544(b)). We then examined decisions of the Pennsylvania Supreme Court in death penalty cases and found that "notwithstanding a procedural bar, it is possible that in a death penalty case the Pennsylvania Supreme Court will not refuse either to entertain a second PCRA petition or to address the claims raised in it." Id. at 212. Accordingly, we held that the district court had erred in

treating the petitioner's claims as procedurally defaulted when state remedies were not clearly foreclosed. See id. at 213.

Although Carpenter filed his S 2254 petition before we decided Banks, the survey of the legal landscape in Banks is equally applicable to Carpenter's petition because the Pennsylvania Supreme Court did not end its practice of relaxing waiver rules in death penalty cases until 1998. See Commonwealth v. Albrecht, 720 A.2d 693, 700 (Pa. 1998) ("While it has been our 'practice' to decline to apply ordinary waiver principles in capital cases, we will not longer do so in PCRA appeals."). Therefore, the claims in Carpenter's S 2254 petition that had not yet been raised in the state courts at the time of the District Court decision were not exhausted, and it was a mistake for the District Court to treat these claims as procedurally defaulted. Instead, it should have dismissed Carpenter's "mixed" petition without prejudice.

D.

Subsequent developments, however, permit us to entertain those claims in this appeal. Although some of the

13

claims in Carpenter's petition were not exhausted at the time of the District Court's decision, the Commonwealth has expressly waived the requirement of exhaustion with respect to these claims. We accept that waiver and accordingly may consider two categories of claims in this appeal.

The first consists of those claims that had been properly presented to the state courts at the time of the District Court decision. Based on our review of the record, these claims are: (1) that trial counsel was ineffective in failing to object at the guilt phase to testimony implying that Carpenter had a prior criminal record [DC 1; Carp.X; A.III];7 (2) that trial counsel was ineffective because he did not adequately prepare Carpenter for his trial testimony and did not question Carpenter adequately when he testified [DC 7, 8; Carp.XI; A.II]; (3) that the jury was improperly precluded from giving exculpatory and mitigating effect to Carpenter's drug and alcohol use [DC 11; Carp. XII; A.IV]; (4) that the notes of testimony from the trial and capital sentencing proceedings are not full and accurate and thereby deprived Carpenter of meaningful appellate review [DC 25; Carp.XVI]; (5) that the penalty-phase instructions unconstitutionally suggested that the jury had to be unanimous about any mitigating circumstance before it could be given effect in the sentencing decision 8 [DC 12; Carp.II; C.VIII]; (6) that the sentencing jury was prevented from considering and giving effect to relevant mitigating evidence when the trial court gave an incorrect charge on duress [DC 4, 14; Carp.VI]; and (7) that Carpenter was denied the effective assistance of counsel when his attorney failed to object on state-law grounds to an allegedly

7. "DC 1" means this was Claim #1 in the District Court's first opinion. "Carp.X" means this was Issue X in Carpenter's brief in this appeal. "A.III" means this was issue A.III in the Commonwealth's brief in this appeal.

8. The Commonwealth asserts that this claim was not raised to the District Court, but we view paragraph 12L of Carpenter's S 2254 petition as raising this issue. However, because we hold that Carpenter's sentence cannot stand for another reason, the question whether this issue is properly before us is of no consequence.

14

erroneous answer given by the trial judge in response to a question asked by the jury.

The second category of claims consists of those that were contained in the original or amended habeas petition but that had not been properly presented to the state courts at the time of the District Court decision. These claims are: (1) that trial counsel was ineffective in failing to call an eyewitness who would have provided exculpatory evidence[9] [DC 16; Carp.VII; B.I; C.XI]; (2) that the Eighth and Fourteenth Amendments were violated because the trial court provided the jury with inaccurate sentencing information about parole and counsel made no effort to correct the trial court's error[10][DC 5, 15; Carp.III; A.VI; B.III;C.XII]; and (3) that trial counsel was ineffective in failing to investigate, develop, and present significant mitigating evidence[11] [DC 3, 24; Carp.I; A.V, B.II, C.XIII].

In this appeal, Carpenter also advances claims that he never presented to the District Court but that he did present (unsuccessfully) to the state courts in his second PCRA petition. Since the District Court had no opportunity to review these claims, the District Court did not err in failing to render any decision concerning them. As a result, we have no basis for reversing the decision of the District Court with respect to these claims. The claims that are not properly before us are: (1) that trial counsel was ineffective in failing adequately to counter the prosecution's evidence of an aggravating circumstance [Carp.I]; (2) that trial counsel was ineffective because he made an inadequate and harmful closing argument [Carp.I; C.VII]; (3) that the sole aggravating circumstance found is unconstitutional

9. The Commonwealth asserts that, in the District Court, Carpenter argued only that the eyewitness would have corroborated Carpenter's testimony and not that the eyewitness's testimony would have been helpful in other ways. We discuss that issue infra at pp. 23-24.

10. We view this claim as subsumed with the claim raised in the state courts.

11. Because we hold that Carpenter's sentence cannot stand for another reason, we find it unnecessary to reach this ineffective assistance claim,

and thus we need not decide which portions of the argument are properly before us.

because it was based on an unconstitutional prior conviction [Carp.IV; C.V]; (4) that the sole aggravating circumstance in this case is unconstitutionally vague [Carp.V; C.VI]; (5) that Emmil was an unreliable witness and that counsel provided ineffective assistance with respect to this witness [Carp.VIII; C.III]; (6) that trial counsel was ineffective in failing to object to opinion testimony of parole officer Jefferies [Carp.IX; C.IV]; (7) that trial counsel was ineffective in failing to object to a variety of errors [Carp.XIII]; (8) that Carpenter was denied the effective assistance of counsel on direct appeal[Carp.XIV; C.IX]; (9) and that Carpenter is entitled to habeas relief because of the cumulative prejudicial effect of the errors [Carp.XV; C.X].

III.

We turn to the merits of Carpenter's guilt-phase claims that are properly before us for review.12  We will discuss these claims seriatim, but since most of them involve allegations of the ineffectiveness of trial counsel, we will first discuss the test for ineffective assistance claims.

In order for a defendant to gain relief based on a constitutional claim that his counsel was ineffective, the defendant must satisfy the two-pronged test announced in Strickland v. Washington, 466 U.S. 668 (1984). The defendant must show "(1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." United States v. Nino, 878 F.2d 101, 103 (3d Cir. 1989) (citing Strickland, 466 U.S. at 687-96). Both Strickland prongs must be met in order to merit relief. Nino, 878 F.2d at 104.

With regard to the first prong, the Supreme Court has instructed that "[t]he proper measure of attorney performance" is "reasonableness under prevailing

---

12. In so doing, we apply the pre-AEDPA version of 28 U.S.C. S 2254, because Carpenter filed his petition before the effective date of AEDPA. See Henderson v. Frank, 155 F.3d 159, 163 (3d Cir. 1998).

professional norms," Strickland, 466 U.S. at 688, that "[j]udicial scrutiny of counsel's performance must be highly deferential," and that "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. With regard to the second prong, a reasonable probability

is one that is "sufficient to undermine confidence in the outcome." Id. at 694.

Under the pre-AEDPA version of 28 U.S.C. S 2254, a state court's legal conclusion regarding either prong of the Strickland test must be reviewed de novo. See Berryman v. Morton, 100 F.3d 1089, 1094 (3d Cir. 1996). State court findings of fact, however, are presumed correct if there was: (1) a hearing on the merits of a factual issue, (2) made by a state court of competent jurisdiction, (3) in a proceeding to which the petitioner and the state were parties, (4) and the state court's determination is evidenced by a written finding, opinion, or other reliable and adequate written indicia. See 28 U.S.C. S 2254(d); Reese v. Fulcomer, 946 F.2d 247, 254 (3d Cir. 1991). If these requirements are met, " '[t]he underlying facts about counsel's performance are entitled to the presumption of correctness under 28 U.S.C. S 2254(d), if fairly supported by the record.' " Id. (citation omitted)

Where, as in this case, the District Court has not held an evidentiary hearing or engaged in independent fact finding and the evidence is limited to that contained in the state court record, our review of the District Court's decision is plenary. See Lesko v. Owens, 881 F.2d 44, 50-51 (3d Cir. 1989); Hakeem v. Beyer, 990 F.2d 750, 758 (3d Cir. 1993). With these standards in mind, we now consider Carpenter's claims.

A.

Carpenter argues that his trial counsel was ineffective because he did not immediately object to testimony that implied that Carpenter had a prior criminal record. The prosecution called as a witness Carpenter's parole officer Donald M. Jefferies, who testified about a conversation he had with Carpenter after Taylor attacked him with a

hatchet. At the beginning of his testimony, Jefferies stated that he was employed as a parole agent by the Pennsylvania Board of Parole. He later testified that he warned Carpenter not to try to get even with Taylor. According to Jefferies, he said something like:"[Y]ou can't do it by yourself, this is what we have police for. This is what my job is to help you out with the situation ." NT-II at 50 (emphasis added). Carpenter argues that any reasonable juror would conclude from this testimony that Carpenter had a criminal record sufficiently serious to require that he be monitored on parole.

Trial counsel did not immediately object to Jefferies' testimony, but instead objected three witnesses later. Counsel explained that he did not hear the testimony because Carpenter was talking to him at the time and that he objected when someone brought the statements in question to his attention. Although the trial judge believed that Jefferies's statements might have been somewhat

prejudicial, the judge did not think that the prejudice was severe enough to justify a mistrial. The judge offered to give a curative instruction, but Carpenter's attorney declined because he thought that the instruction would do more harm than good. In this appeal, Carpenter argues that his trial counsel was ineffective, not because he refused a curative instruction, but because of his initial failure to object.

On direct appeal, Carpenter contended that the disclosure of Jeffries's occupation and his acquaintance with Carpenter tainted the trial, but the Pennsylvania Supreme Court rejected that argument, concluding that this information resulted in "little, if any, prejudice" since there "there are an infinite variety of ways that[Carpenter] might otherwise know a person who was a parole officer." Commonwealth v. Carpenter, 515 A.2d at 535. In his first PCRA petition, Carpenter returned to this ground, contending that his trial attorney had rendered ineffective assistance by failing to object to the testimony in question, but the Pennsylvania Supreme Court again disagreed. The Court reasoned that the ineffective assistance claim necessarily failed in view of its holding on direct appeal that Carpenter had not been prejudiced by Jefferies's

18

statements. Commonwealth v. Carpenter, 617 A.2d at 1266. The District Court similarly rejected this claim, noting that counsel eventually objected and moved for a mistrial and that the alleged prejudice was "at best speculative." Carpenter v. Vaughn, 888 F. Supp. at 648.

We see no merit in this claim. First, we do not think that Carpenter has established that counsel's handling of this matter fell below the minimally acceptable constitutional standard. No evidence has been called to our attention that contradicts counsel's testimony that Carpenter was talking to him and distracted him when the testimony in question came in, and the record clearly shows that counsel subsequently addressed the issue by making an objection and moving for a mistrial. While it is obviously important for a trial attorney to maintain concentration on the testimony of adverse witnesses, we cannot say that counsel's momentary distraction, under the circumstances, was enough to render his performance constitutionally deficient. Moreover, we agree with the Pennsylvania Supreme Court and the District Court that the prejudice prong of Strickland is not met. Jeffries's comments do not "undermine confidence in the outcome" of the trial. Strickland, 466 U.S. at 694.

B.

Carpenter next contends that trial counsel was ineffective in (a) preparing Carpenter to testify and (b) questioning him when he took the stand. When Carpenter testified, he did so largely in a narrative fashion, and he made some damaging statements. He admitted that he had a desire to

attack Taylor after Taylor hit him with the hatchet; that he had slept with another woman when he was mad at Emmil; that he had lied to the police; and that he had urged another witness to lie to the police. Most important, Carpenter testified that Emmil had told him that she was about to take a police polygraph test. (The results of the polygraph, however, were not disclosed.)

In an evidentiary hearing in the first PCRA proceeding, Carpenter and his attorney testified about their pre-trial preparation. According to Carpenter, his attorney spent

little time with him before trial. Carpenter testified that his attorney met with him twice for a total of 15 minutes and that a defense investigator met with him for about an hour. Tr. of PCRA Proceeding 7/20/89, at 7-9, 29. Trial counsel, however, testified that he met with Carpenter numerous times, that he had "quite lengthy discussions about his testimony," and that Carpenter also gave him "extensive notes. Id. at 51. Trial counsel stated that Carpenter insisted on the defense that Emmil had stabbed Taylor. Id . at 52-53. Trial counsel testified that he told Carpenter that this story did not seem as believable as Emmil's and that he mentioned an alternative defense but that Carpenter "was quite clear, I'm sure, the whole way through that this was his approach and there were no other alternatives." Id. at 54.

The PCRA court and the state supreme court plainly credited the testimony of Carpenter's attorney. The state courts noted that Carpenter "was very familiar with the criminal justice system and there was extensive preparation of [Carpenter] for this trial." Commonwealth v. Carpenter, 617 A.2d at 1270. The state supreme court added: "Under such circumstances, we agree that counsel cannot be blamed for [Carpenter's] voluntary decision to expand his prepared testimony and make damaging remarks." Id.

Carpenter contends that these findings are not adequately supported by the record. Carpenter argues that, although his attorney testified that he met with him at length, "there is no evidence that trial counsel spent any time preparing Mr. Carpenter to testify." Appellant's Br. at 165. Carpenter also maintains that "there is no evidence to support the state court's claim that Mr. Carpenter's damaging statements resulted from a decision to 'expand his prepared testimony.' " Id.

We believe that the findings of the state courts are adequately supported by the testimony of Carpenter's attorney. As noted, Carpenter's trial attorney testified that he and Carpenter had "quite lengthy discussions about his testimony." Tr. of PCRA Proceeding 7/20/89 at 51. See also id. at 52. While it does not appear that counsel stated directly that the damaging statements about which Carpenter now complains were not included in the

testimony that counsel and Carpenter discussed, that is a fair inference from the record.

We also note that some of the damaging testimony now cited by Carpenter would very likely have come out on cross-examination even if Carpenter's testimony had been presented in closely controlled question-and-answer form. For example, a cross-examiner would very likely have elicited that Carpenter wanted to strike back at Taylor after Taylor hit him with a hatchet and that Carpenter had lied to the police. While Emmil's out-of-court statement that she had taken a polygraph would not have been admissible, there is nothing in the record to suggest that Carpenter's attorney had any advance warning that Carpenter would recount that statement.

In view of the testimony of Carpenter's attorney, which the state courts reasonably credited, we reject Carpenter's claim that his attorney fell below the minimum constitutional standard in preparing him to testify and in conducting the direct examination.

C.

Carpenter contends that the trial court erred in failing to give an instruction on intoxication at the guilt or penalty stage and that the trial counsel was ineffective for failing to attempt to argue intoxication. The Pennsylvania Supreme Court rejected these arguments in the first PCRA petition, finding that there was no evidence at trial that Carpenter was drunk or unaware of what he was doing. See Commonwealth v. Carpenter, 617 A.2d at 1268. Since there was no evidence to support a request for an instruction on intoxication, the Court reasoned, Carpenter's counsel was not ineffective in failing to ask for the charge or argue the issue to the jury. The District Court rejected this claim on similar grounds. See Carpenter v. Vaughn, 888 F. Supp. at 653.

Carpenter argues that the evidence at trial raised the possibility that he was intoxicated at the time of the stabbing. Thus, he argues, his attorney should have requested, and the court should have given, an intoxication instruction, which might have persuaded the jury that he

lacked the capacity to form the intent to kill and therefore might have resulted in a verdict of third-degree, rather than first-degree, murder. In response, the Commonwealth contends that the evidence showed that Carpenter was clearly not intoxicated at the time of the murder. Moreover, the Commonwealth argues that trial counsel was not ineffective since, even if he could have pursued an intoxication defense, it would have been tactically unwise to argue alternative theories to the jury -- i.e., that Carpenter

did not commit the murder but that, if he did, he was intoxicated at the time.

Under 18 Pa. Cons. Stat. S 308, intoxication is not a defense to a criminal charge "except that evidence of such intoxication or drugged condition of the defendant may be offered by the defendant whenever it is relevant to reduce murder from a higher degree to a lower degree of murder." The Pennsylvania Supreme Court has interpreted this to mean that "in order for intoxication to reduce murder from a higher to a lower degree, it must be proven that the actor was overwhelmed to the point of losing his faculties and sensibilities." Commonwealth v. Breakiron, 571 A.2d 1035, 1041 (Pa. 1990) (citing Commonwealth v. Reiff , 413 A.2d 672, 674 (Pa. 1980)).

In Commonwealth v. Reiff, supra, the evidence at trial showed that the defendant had consumed two-and-one-half quarts of beer and smoked marijuana the night of a murder. The Supreme Court of Pennsylvania affirmed the trial court's refusal to give an intoxication instruction:

> Drinking and intoxication are not synonymous terms; therefore a jury instruction on intoxication is not warranted because evidence of drinking is introduced at trial. It is the intention of the legislature that a defendant be overwhelmed or overpowered by alcoholic liquor to the point of losing his or her faculties or sensibilities before an intoxication instruction be given.
>
> In the instant case, there was no evidence that appellant was intoxicated or had lost his faculties or sensibilities. In Commonwealth v. Kichline, 468 Pa. 265 (1975), this Court stated that there must be sufficient evidence of intoxication in the record to bring that

22

> issue into the case before the trial court is required to instruct the jury on an intoxication defense. As there was insufficient evidence of intoxication in the record, the trial court did not err in refusing to instruct the jury on an intoxication defense.

Id. at 674.

In the present case, Emmil testified that she and Carpenter had smoked marijuana on the evening of the killing. She also testified that they had drunk together for about an hour. Trial Tr., 1/18/84 at 22-24. Likewise, Carpenter and others testified that he had drunk several beers and smoked some marijuana on the night in question. The Pennsylvania Supreme Court held, however, that this evidence was insufficient to justify an intoxication instruction. We cannot review this decision on a question of state law, and this holding dooms Carpenter's ineffective assistance claim, since his attorney cannot have been ineffective for failing to request an instruction that was unavailable.

Moreover, at the PCRA evidentiary hearing, trial counsel provided a perfectly reasonable tactical explanation for his decision not to attempt to mount an intoxication defense. After observing that he did not think the defense was "available,"counsel added:

> And I certainly wouldn't stand up to the jury and argue it, given Mr. Carpenter's story, the testimony he gave as to his version of events.

PCRA Hearing, 7/20/89, at 54. This was a reasonable tactical decision.

D.

Carpenter argues that he was denied the effective assistance of counsel because his trial attorney failed to call an eyewitness named Frankie Stewart who could have helped his case either by corroborating his testimony to some degree or by providing an entirely different defense theory. Before trial, Stewart provided three accounts of the Taylor homicide. AB at 140-43; Carpenter v. Vaughn, 888 F.

23

Supp. at 662-64. Stewart's first version, as recounted in a police report, was as follows:

> [Stewart] was at 49 S. Penn St. and was leaving. She saw the victim walking with a [Caucasian] male and a [Caucasian] female. She saw the female turn to the victim and make a motion. The victim then fell to the position in which he was lying upon the arrival of the officers. The suspects then walked south on the sidewalk to King St. and turned west on King. A few seconds thereafter, the officers arrived.

Id. at 662-63.

Stewart's second account was also set out in a police report:

> FRANKIE STEWART . . . was leaving her parents' home located directly across from 50 S. Penn St. when she observed the victim fall over backwards to the sidewalk and observed two persons walking away from the victim. Frankie Stewart stated that she had . . . seen the two actors in the area before and that she could i.d. the two actors if she saw them again. She stated that she knew the one actor as BOB--that he's always down at PAUL BROWN'S place on W. Princess St.

Id. at 663.

Stewart's third version was recounted in a verbatim statement taken during police questioning:

> Q Will you tell me what you heard or observed?

A I was coming out of my parents' home at 49 S. Penn St. I was going toward my car. I looked across the street and I seen a man on the ground. Two white people walked around the corner. During this time a police officer was coming down the street. I hailed him down. That's it.

. . . .

Q At any time did you see these 2 white persons near where Jimmy had fallen?

A No.

24

Q Do you know a HELEN RUTH EMEL [sic]?

A Yes.

Q Do you know a JAMES CARPENTER?

A Yes, I do but I didn't know that was his last name till I saw it in the paper.

. . . .

Q Did you see those people in the area?

A Nope.

Id. at 663-64.

In a recent affidavit, Stewart stated, "I was at my mom's house and I had been drinking a lot. I was just starting to leave my mom's house and I saw Jimmy Lee [Taylor] fall. James Carpenter was not in the immediate area when Jimmy Lee [Taylor] was stabbed." Appellant's Br. at 143 n.89.

Carpenter argues that Stewart's statement that a white woman turned toward Taylor and made "a motion" just before he fell would have corroborated his testimony that Emmil stabbed Taylor since Emmil is white. But by the same token, any of the three accounts provided by Stewart before trial would have contradicted Carpenter's testimony in important respects. Carpenter, an African American, claimed that Emmil had killed Taylor, and both he and Emmil agreed that they were the only other persons present at the time. Therefore, testimony from Stewart either 1) that two Caucasians were present when Taylor was stabbed, 2) that "BOB" had killed Taylor,13 or 3) that Carpenter was not in the area when Taylor was killed, would have been fundamentally inconsistent with Carpenter's account. Moreover, Stewart's admission that she "had been drinking a lot" probably would have undermined the value of her testimony. Under these circumstances, it was objectively reasonable for Carpenter's counsel not to call Stewart as a

13. As the District Court noted, " 'Bob' was later located by the York police and was able to account for his whereabouts at the time of the murder." Carpenter v. Vaughn, 888 F. Supp. at 665.

witness to "corroborate" his client, and Carpenter was not prejudiced by the lack of such "corroboration."

We also see no merit in Carpenter's alternative suggestion that counsel was ineffective in failing to present a defense in which Stewart would testify and Carpenter would either not testify at all or testify differently. We have found no indication that this argument was made in the state courts or the District Court. But in any event, in view of the inconsistencies in Stewart's accounts and the testimony of Carpenter's attorney that Carpenter was insistent on telling his story (and Carpenter's briefs do not point to any contradictory evidence), the decision not to pursue the alternative approach now suggested did not violate Carpenter's constitutional right to the effective assistance of counsel.

E.

Carpenter argues that the trial transcripts are inaccurate and that this prevented him from obtaining meaningful appellate review. However, the Pennsylvania Supreme Court noted that "[t]he PCRA court . . . found as a fact that the trial transcript had not been altered by anyone to [Carpenter's] detriment." Commonwealth v. Carpenter, 725 A.2d at 169. See also Commonwealth v. Carpenter , No. 2014, at 34-35 (Pa. Ct. Comm. Pl. 7/31/90) (App. Vol. I, at 103-04) ("The defendant is obsessed with the idea that [there was a conspiracy to alter the transcript] . . . . However, this was categorically denied by the defendant's trial counsel . . . . There is positively no evidence to support the defendant's claim."). The District Court gave Carpenter an opportunity to proffer factual support for this claim, but Carpenter did not submit any. Carpenter v. Vaughn, 888 F. Supp. at 668. Even now on appeal, Carpenter provides no support for this claim. He asks for an evidentiary hearing, but he fails to specify what in the record is inaccurate or to state what would be presented at an evidentiary hearing.

We find this claim to be without merit. In Tedford v. Hepting, 990 F.2d 745 (3d Cir. 1993), we explained:

        Analysis properly begins with the observation that
        plaintiff does not have a constitutional right to a totally

        accurate transcript of his criminal trial. His
        constitutional rights would be violated only if
        inaccuracies in the transcript adversely affected the

outcome of the criminal proceeding. And, since the jury which convicted plaintiff and sentenced him to death acted on the basis of the evidence they saw and heard, rather than on the basis of the written transcript of the trial--which was, of course, non-existent until after the trial was completed--this means that a constitutional violation would occur only if the inaccuracies in the transcript adversely affected appellate review in the state courts. The threshold question, therefore, is . . . whether plaintiff has alleged deficiencies in the trial transcript substantial enough to call into question the validity of the appellate process in the state courts.

Id. at 747.

Here, Carpenter clearly has not "alleged deficiencies in the trial transcript substantial enough to call into question the validity of the appellate process in the state courts." Id. Nor has he alleged that any specific issue for appellate review was hampered by inaccuracies in the trial transcript. See id. The state courts' finding of fact that the trial transcripts are accurate has a more than adequate basis in the record. Thus, this claim is without merit.14

The remainder of Carpenter's guilty-phase claims were raised in the federal courts for the first time in his appellate brief to us. Accordingly, these claims are not part of the S 2254 petition that he filed in the District Court and are not properly before us for review.

IV.

We now turn to the penalty phase of Carpenter's trial. Although several arguments relating to the performance of

_____

14. We also note that Carpenter's prior appellate counsel stated in a declaration: "Mr. Carpenter . . . believed that there was a conspiracy . . . to alter the case transcripts and to hurt him. He complained of days of testimony being appended to the record after the trial ended. His ramblings were illogical and made no sense to me." Id. (quoting Declaration of C.N. Patterson P2).

trial counsel at the penalty phase are properly before us, we find it necessary to address only one -- the claim that trial counsel was ineffective in failing to object to the judge's answer to a question asked by the jury shortly before it returned its verdict of death. We hold that this claim has merit and requires that the writ be granted as to Carpenter's sentence unless a new penalty-phase trial is held.

Under Pennsylvania law, a defendant convicted of first-degree murder had to be sentenced to death or life imprisonment, 18 Pa.C.S.S 1102(a), and a defendant sentenced to life could not be paroled, 42 Pa.C.S.S 9756(c); 61 Pa.C.S. S 331.21; Commonwealth v. Yount , 615 A.2d

1316 (Pa.Super. 1992), unless the sentence was first commuted by the governor to a term of years. See Myers v. Gillis, 93 F.3d 1147, 1154 (3d Cir. 1996). As previously noted, the aggravating circumstance charged in this case was that Carpenter had "a significant history of felony convictions involving the use or threat of violence to the person." 42 Pa. C. S.S 9711(d)(9). To establish this aggravating circumstance, the prosecution proved that Carpenter had previous convictions for third-degree murder[15] and assault by a prisoner. The jury was also aware that Carpenter had been released on parole after serving time for the prior murder and that he had threatened to get revenge on the prosecution's chief witness.

After a period of deliberation, the jury sent out a note inquiring: "Can we recommend life imprisonment with a guarantee of no parole." The judge responded as follows:

> The answer is that simply, no absolutely not. Moreover, ladies and gentlemen, you talk about recommendation. I don't know exactly what you mean, but I assume you remember what I told you before, that you as a jury at this point are not making a recommendation of death or life imprisonment. I hope you understand that.
>
> You folks are actually fixing the sentence, and not

---

15. Under Pennsylvania law, third degree murder is any murder not of the first degree (an intentional killing) or second degree (felony murder). See 18 Pa.C.S. S 2502.

28

> the Court. It is not the recommendation. Whether you mark on there death, that's the sentence and there is nothing this Court can do about it. The Court has nothing to do on it. If you mark life imprisonment, there is nothing this Court can do about it or wants to do about it, because that decision is entirely up to you as members of the jury. So, I hope you understand that it is not a recommendation, it is a sentence that will bind all of us here to whatever you fix and it's going to have to be very simply death or life imprisonment. And the question of parole is absolutely irrelevant. I hope you understand that.

Trial counsel did not object to this answer or request clarification or amplification. After less than nine minutes of additional deliberation, the jury returned a verdict of death.

In the appeal from the denial of Carpenter's first PCRA application, Carpenter contended that his attorney was ineffective in failing to object to the judge's answer to the jury. The Pennsylvania Supreme Court responded to this argument as follows:

> As can be seen, the trial court was concerned that the

jury may have misunderstood that they were setting the sentence and not making a recommendation. We think he adequately explained that the jury sets the sentence and whatever it may be will be carried out without interference from any other source. To underscore this, he repeated that the court would not tamper with their verdict and that the question of parole is irrelevant. Read in context, we find nothing improper with this explanation and reject Appellant's tortured reading of three words.

Commonwealth v. Carpenter, 617 A.2d at 1269.

Commenting on this analysis, the District Court stated:

The problem with this reading of the jury's question is that its obvious import is overlooked. The jury did not just ask whether it was recommending a sentence; it asked whether it could recommend a particular sentence, one of life imprisonment without parole. The

29

rather obvious concern reflected in such a question is not a recommendation, but whether petitioner would be paroled if a death sentence was not returned. Unlike the Supreme Court of Pennsylvania, we do not find this interpretation of the jury's question and the trial court's response to be a "tortured reading" of the question and answer, nor do we see this reading as petitioner's overzealous attempt to "manufacture an error."

Carpenter v. Vaughn, 888 F.Supp. at 645-50.

We must agree with the District Court in this regard.16 While it was prudent for the trial judge, in answering the jury's question, to emphasize that its verdict was not merely a recommendation, it is apparent that the jury's concern centered on the availability of a sentence of life imprisonment without parole. And the judge's initial response -- "The answer is that simply, no absolutely not" -- clearly conveyed the misleading impression that such a sentence was not available. In a case in which it had been proven that the defendant was a homicidal recidivist who had previously been paroled and in which it was apparent that the jury was concerned about the possibility of future parole, this was a potentially devastating message, and there are strong grounds for believing that it had a devastating effect in this case. It was also, as noted, a plain misstatement of Pennsylvania law, under which a person serving a life sentence that has not been commuted to a term of years may not to be paroled. See Commonwealth v. Clark, 710 A.2d 31, 35 (Pa. 1998).

_____

16. The first sentence is somewhat unclear as to whether the "no absolutely not" applies to the "recommendation" part of the question or the "life imprisonment with a guarantee of no parole" part, but we

suggest that common sense makes it more likely that the judge was talking about the latter. This supposition is strengthened by the fact that the second sentence begins with the word "moreover," and then proceeds to explain that the jury is not "recommending" anything. "Moreover" implies that the Court was moving on to a new topic and if the "recommendation" issue was a new topic, then the first sentence was about the "life with no parole" point. The court did conclude its answer by stating that "the question of parole is absolutely irrelevant," but that does not do anything to undercut the belief that it is possible.

30

On receiving the jury's question, the trial judge appears to have focused on the jury's use of the word "recommend" and to have overlooked the issue of parole. This was a situation in which assistance from counsel might very well have corrected the problem. The trial judge knew that Carpenter could not be paroled while serving a life sentence. If Carpenter's attorney had told the judge that his answer inadvertently conveyed the contrary impression and thus misstated Pennsylvania law on a point that could play a critical role in the jury's decision, we have little doubt that the judge would have corrected his answer. But counsel did not object. The failure to object under these circumstances fell below an objective standard of reasonableness, and there is a reasonable probability that, but for counsel's error, the jury would not have returned a verdict of death. See Strickland, 466 U.S. at 687-96. We recognize that the trial judge ended his answer to the jury by stating that "the question of parole is absolutely irrelevant," but as a practical matter, this brief and weak statement was not likely to erase the highly prejudicial impact of the false impression that Carpenter might be paroled if he was not executed.

The comments made by the Pennsylvania Supreme Court in Carpenter's first PCRA appeal do not convince us either that counsel's failure to object was objectively reasonable or that an objection would not have assisted his client. As previously noted, in response to the argument that the trial judge's answer misled the jury to believe that parole would be available if Carpenter was sentenced to life imprisonment, the Pennsylvania Supreme Court stated that Carpenter was relying on "a tortured reading of three words" (i.e., "no absolutely not") and that"[r]ead in context" there was "nothing improper with [the judge's] explanation." 617 A.2d 1269. The Pennsylvania Supreme Court also stated that Carpenter's argument took "a phrase out of context and read into it his own meaning." Id .

We recognize that it can be argued that the state supreme court's remarks in effect approved the response that the trial judge gave to the jury -- i.e., held that the response was not erroneous as a matter of state law-- but we reject this reading because it squarely conflicts with the

31

governing state statutes. As noted, under state law, Carpenter could not have been paroled while serving a life sentence. The state supreme court can hardly have meant to suggest that it was proper for the trial judge to give the jury false information about this important feature of state law.

Instead, we believe that the state supreme court was addressing the argument that was presented to it-- that Carpenter's attorney was constitutionally ineffective in failing to object to the judge's answer -- and that the state supreme court's comments were meant to say one or both of the following: (a) that counsel's performance was not objectively unreasonable because the "three words" at issue were unimportant when read in "context" or (b) that Carpenter was not prejudiced by those "three words," again, because they were unimportant when read in "context." Commonwealth v. Carpenter, 617 A.2d at 1269.

In this pre-AEDPA case, we must conduct a de novo review of the application of both prongs of the Strickland standard, and for the reasons already explained, we must respectfully disagree with the Pennsylvania Supreme Court's evaluation of the significance of the "three words" in question. Unlike the state supreme court, we think that, particularly when read in the context of the evidence presented to the jury and the evident concern that prompted the jury's question, those words carried a great potential for harm. We also think that counsel made a very serious mistake in failing to realize the danger presented by the trial judge's answer and in failing to point out the problem to the judge. The jury's question should have put counsel on alert, and the first words out of the judge's mouth in response should have triggered deafening alarm bells in counsel's head.

We thus hold that the failure of trial counsel to object based on state law17 to the judge's answer to the jury's

_____

17. The Appellee's brief (at 21 (brackets added)) states:

> The Commonwealth assumes, for purposes of this brief, that counsel may be found ineffective for purposes of federal habeas corpus review when the allegation of ineffectiveness is premised

32

question violated Carpenter's constitutional right to the effective assistance of counsel. To dispel any possible confusion, we emphasize that our holding is not based on any other federal constitutional right or on Simmons.18 We accept the precise argument that Carpenter made in his first PCRA appeal: that the failure of his trial counsel to object based on state law constituted ineffective assistance of counsel.

In light of this holding, we see no need to reach any of the other contentions that are properly before us and that

relate to alleged ineffective assistance at the penalty phase.19
Nor is it necessary to consider whether the penalty-phase
instructions regarding mitigating circumstances provide a

---

exclusively upon the failure to raise a state law claim. Compare
Claudio v. Scully, 982 F.2d 798 (2d Cir. 1992), cert. denied, 508 U.S.
912 (1993) (pre-AEDPA), with id. at 807-08 (Newman, J.,
dissenting), and with Sellan v. Kuhlman, 63 F.Supp.2d 262 (E.D.N.Y.
1999) (per Trager, J.)(post-AEDPA)"[overruled on this point by Sellan
v. Kuhlman, 261 F.3d 303,309 (2d Cir. 2001)].

The contrary argument seems implausible, but the issue has not been
briefed, and for present purposes, it is sufficient to accept the
Commonwealth's assumption.

18. As previously noted, see supra at 8-9 & n. 4, Simmons and its
progeny concern a capital defendant's due process right to an instruction
at the penalty phase on the possibility of parole when the prosecution
puts the defendant's future dangerousness in issue and the only
alternative to the death penalty is life imprisonment without parole. Our
decision here is not based on due process but on the right to the
effective assistance of counsel, and our decision is not based on the
prosecution's raising of the issue of the defendant's future
dangerousness but on defense trial counsel's failure to object when the
trial judge gave a dangerously misleading response to the jury's question
about the availability of a life sentence without parole.

19. In the brief filed on Carpenter's behalf in this appeal, his present
attorneys argue Carpenter's trial counsel did not provide effective
representation at the penalty phase because he allegedly did not
adequately investigate, develop, and present mitigating evidence. We
have no reason to believe that at any future penalty phase proceeding
Carpenter's present attorneys will not diligently investigate, develop, and
present, and will not be given the opportunity to present, any such
evidence.

33

ground for relief under Mills v. Maryland, 486 U.S. 367
(1988), and Frey v. Fulcomer, 132 F.3d 916 (3d Cir. 1997),
cert. denied, 524 U.S. 911 (1998). Mills and Frey provide
guidance with respect to the instructions that should be
given at any subsequent penalty phase trial. Likewise, we
do not find it necessary to address the instruction on
duress given at the penalty phase. The state courts
recognized that this charge was inappropriate, and thus
there is no reason to believe that the same charge will be
given at any subsequent penalty phase trial.

V.

For the reasons explained above, we affirm the decision
of the District Court in part and reverse in part and remand
for the sole purpose of granting a writ of habeas corpus
unless, within a time to be set by the District Court, a new
penalty phase trial is held or the petitioner is resentenced
to a term of life imprisonment.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

34